David V. MEYER, Geraldine A. Meyer, James F. Murphy as custodian for Timothy J. Murphy, Pamela A. Murphy, Thomas A. Murphy, Irene N. Wilson, Steven E. Wilson, and Wendell E. Wilson, Plaintiffs,

v.

Jerry G. DYGERT, Kathryn E. Dygert, Dygert Law Office, and Kurt H. Jensen, Defendants.

Civil No. 99–618 MJD/JGL.

United States District Court, D. Minnesota.

June 11, 2001.

See, also, 2000 WL 630833.

John R. Stoebner, David A. Harbeck, Lapp, Laurie, Libra, Thomson & Stoebner, Charted, Minneapolis, MN, for Plaintiffs.

Thomas J. Shroyer, Jerrie M. Hayes, Moss & Barnett, Minneapolis, MN, for Defendants Kathryn Dygert, Jerry Dygert, Dygert Law Office.

## MEMORANDUM OPINION AND ORDER

DAVIS, District Judge.

### INTRODUCTION

This matter is before the Court on Defendant Kathryn Dygert's motion for summary judgment and on Jerry Dygert and Dygert Law Office's motion for summary judgment. In response to Defendant Kathryn Dygert's motion, Plaintiffs have agreed to voluntarily dismiss their claims of common law fraud, state and federal securities law violations and RICO violations against Mrs. Dygert. Thus, the only claims left to be decided with respect to Mrs. Dygert are those arising under the Minnesota Consumer Fraud Act, conversion and unjust enrichment. With respect to Defendants Jerry Dygert and Dygert Law Office, Plaintiffs have agreed to voluntarily dismiss their conversion, unjust enrichment and RICO claims. The claims remaining against Jerry Dygert and the Dygert Law Office are claims of common law fraud, breach of fiduciary duty, legal malpractice, state and federal securities fraud and those arising under the Minnesota Consumer Fraud Act.

### BACKGROUND

The Organic Conversion Corporation ("OCC") was incorporated in 1965 as a compost bagging and distribution facility, converting stockyard waste into gardening product for retail sale. OCC eventually expanded its product line to include peat and other soil products. Robert W. Dygert was one of OCC's founders and served as an officer and/or director for several years. Robert Dygert Dep. at 17.

In the mid–1970's, Robert Dygert devised a mechanism for increasing OCC's working capital; he would solicit private investments in the company that were evidenced by a promissory note secured by a mortgage on OCC's assets and inventory, referred to as Junior Mortgage Notes. To induce investors to participate in the Junior Mortgage Note program, Robert Dygert also offered his personal guarantee. Robert Dygert Dep. Exs. 5–11, and 12. This investment program was authorized by resolution of the Unanimous Consent of Shareholders dated October 20, 1976, which allowed corporate officers to:

> borrow such further sums, without limitation as to amount, as may be deemed necessary to finance the operation of the company, from corporate officers, financial institutions or private persons, and to pledge as security therefore any or all of the company's real and personal property, inventories or accounts receivable. This authorization shall continue in full force and effect until and unless revoked by further action of the shareholders of the corporation.

Jerry Dygert Dep. Ex. 7. Both Robert and Jerry Dygert, as shareholders in OCC, signed this resolution. *Id.*

Robert Dygert subsequently obtained approximately $6.1 million dollars through the Junior Mortgage Note program. Findings of Fact, Conclusions of Law and Order for Summary Judgment in the mat-

ter of *In re Dygert*, 2000 WL 630833, Adv. No. 98–4363 (Bankr.D.Minn.2000) at p. 3 (Harbeck Ex. G). The Plaintiffs herein are individuals that invested in the Junior Mortgage Notes. Generally, they were either friends of the Dygert family, and/or clients of the Dygerts' law practice.

Robert Dygert sent quarterly reports to investors in the Junior Mortgage Note program, which included information as to the company assets, sales and profit before taxes and as to the investor's interest payments and balance. *Id.* at 7; Robert Dygert Dep. Ex. 14. No information was provided the investors concerning the company's liabilities, including the full extent of the outstanding Junior Mortgage Notes. *Id.*

In July 1998, OCC filed bankruptcy pursuant to Chapter 11 of the Bankruptcy Code. Robert Dygert also filed for personal bankruptcy. As a result of these bankruptcies, Plaintiffs allege they have lost all or substantially of their investments.

### 1. Defendant Kathyrn Dygert

Kathryn Dygert is Robert Dygert's wife. She is and has been a stay-at-home wife and mother. She asserts that without her knowledge and consent, Robert transferred 775 shares of OCC stock into her name in 1986. Kathryn Dygert Dep. at 13–14. By the time OCC filed for bankruptcy in 1998, she was one of three shareholders, owning 47% of OCC's stock.

It is Kathryn Dygert's position that she did not participate in any shareholder's meetings, nor did she receive any shareholder materials, information or updates. *Id.* at 26, 29–30 and 61–62. She admits that Robert Dygert, on occasion, would bring OCC-related work home, such as drafting and mailing letters, and that she occasionally helped stuff such letters into envelopes. *Id.* at 44–48 and 56–57. She was also generally aware that her husband was soliciting investments in OCC through the Junior Mortgage Note program, but she did not participate in such solicitations. *Id.* 18–19, 26–29 and 32–35. In fact, in her opinion, the Junior Mortgage Note program was not ethical, and it "bothered her terribly" that individuals asked to purchase the notes were clients of her son Jerry Dygert. *Id.* at 31. In addition, she was generally aware that her husband was making personal guarantees of repayment on the Notes and was admittedly uncomfortable that Robert Dygert was making these personal guarantees. *Id.* at 35–37.

Plaintiffs admit limited or no contact with Kathryn Dygert. Plaintiff Geraldine Meyer met Mrs. Dygert on a couple of occasions when she delivered OCC checks to the Dygert home. Geraldine Meyer Dep. at 23. Plaintiff Thomas Murphy testified that on a number of occasions, he delivered money for OCC investments to Kathryn Dygert at the Dygert home. Thomas Murphy Dep. at 28. Plaintiff Wendell Wilson only met with Mrs. Dygert once, but did not speak to anyone about OCC or his investment in OCC except Robert Dygert. Wendell Wilson Dep. at 18 and 24. Finally, Irene Wilson engaged in social small talk with Mrs. Dygert at times, and Mrs.Dygert may have delivered OCC-related documents to Ms. Wilson. Irene Wilson Dep. at 41, 140–141.

### 2. Defendants Jerry Dygert and Dygert Law Office

Defendant Jerry Dygert is Robert Dygert's son, and operates a solo law practice, Defendant Dygert Law Office. He became a shareholder in OCC in 1974 when he agreed to purchase 100 shares of OCC stock. When OCC filed for bankruptcy in 1998, Mr. Dygert's shares amounted to 6% of the company's stock. From 1976 to 1985, Jerry Dygert served on the Board of Directors of OCC, and was elected Assistant Secretary for those same

years. Jerry Dygert Dep. Exs. 6 and 7. During that time period, Jerry Dygert authorized a number of OCC corporate actions. *See id.*

In addition to their involvement in OCC, Jerry and his father also formed a law partnership called Dygert & Dygert. Jerry and Robert Dygert were the only partners in this practice during its existence from 1971 until 1987. The partnership dissolved in 1987 when Jerry decided to open his solo practice. Robert formed a new partnership at that time, but left that practice a year later to devote himself fulltime to OCC as its corporate attorney. Jerry Dygert has admittedly provided legal services to certain of the Plaintiffs, namely Irene Wilson, Thomas Murphy, and Geraldine and David Meyer.

Late in the summer of 1996, Robert Dygert approached Mr. Dygert and told his son that security interests allegedly granted by the Notes had not been perfected. Robert Dygert asked Jerry to represent OCC in perfecting the investor's security interests, which was done through a trust indenture for the benefit of all Note holders.

By early fall of 1997, OCC was in need of additional operating capital. Robert Dygert approached Donald Drapeau for another investment. Mr. Drapeau is Jerry Dygert's domestic partner. Initially, Drapeau was reluctant to provide OCC funds, but he eventually agreed to provide a "last in, first out" working capital loan of $200,000 to OCC in exchange for a security interest in OCC's accounts receivable. Jerry Dygert prepared the Security Agreement between Drapeau and OCC, which, Plaintiffs allege, was in direct conflict with their security interests. Plaintiffs also allege that during the negotiations between OCC and Drapeau, Jerry became aware that OCC had a debt to Junior Mortgage Note holders in the amount of $5 million dollars. In March 1998, Plaintiffs allege that OCC was aware that it needed to file for bankruptcy, yet it continued to pay Drapeau on the loan, until such loan was paid in full.

## DISCUSSION

### Standard

Summary judgment, as a matter of law, is granted when no genuine issue of material fact exist. Fed.R.Civ.P. 56(c). Summary judgment is granted in favor of a defendant when the record clearly demonstrates an absence of evidence to support an essential element of the plaintiff's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In addition, where the plaintiff has completely failed to offer probative material in support of an essential element of its claim, the court is required to enter summary judgment in favor of the defendant. *Erickson v. Aetna Life Insurance Co.,* 777 F.Supp. 1463, 1466 (D.Minn.1991).

### Consumer Fraud Act

Minnesota's Consumer Fraud Act prohibits the:

> act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement, or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby . . .

Minn.Stat. § 325F.69, subd. 1. "Merchandise" is defined in the Act as "objects, wares, goods, commodities, intangibles, real estate, loans or services." Minn.Stat. § 325F.68, subd. 2 (1998).

Defendants argue that Plaintiffs are estopped from pursuing claims under the Consumer Fraud Act because they have consistently referred to the Junior Mortgage Notes as securities. Defendants

then state, with no supporting authority, that Plaintiffs are limited in their causes of action to the remedies provided under the state and federal securities laws. Minnesota law does not, however, support this assertion. In *Jenson v. Touche Ross & Co.*, the plaintiffs brought claims against the defendant pursuant to the Consumer Fraud Act and under the Minnesota Uniform Securities Act based on the sale of investment contracts concerning silver coins. 335 N.W.2d 720 (Minn.1983). The Minnesota Supreme Court specifically held that the Consumer Fraud Act applies to investment contracts [1]. *Id.*, at 728. In this case, the Minnesota Commissioner of Commerce has characterized the Junior Mortgage Notes as securities. The Notes can also be characterized as an intangible interest in OCC, or a loan or mortgage to OCC. Accordingly, the Court finds that the Junior Mortgage Notes are subject to the Act.[2]

Kathryn Dygert argues that there is no theory of liability under the Consumer Fraud Act by which she can be held liable to Plaintiffs. She argues that as she did not sell any Junior Mortgage Notes to the Plaintiffs, nor solicit them for investments or made any representations concerning the Junior Mortgage Notes, she is entitled to summary judgment as to the Consumer Fraud Act asserted against her.

■ Initially, the Court notes that Plaintiffs correctly argue that the Act does not require the making of an intentional misrepresentation. *See, McNamara v. Nomeco Bldg. Specialties, Inc.*, 26 F.Supp.2d 1168, 1171 (D.Minn.1998)(listing cases). Thus, the fact that Kathryn Dygert may not have made an intentional misrepresentation concerning the Junior Mortgage Notes to Plaintiffs does not defeat their claim.

■ Plaintiffs theory of liability rests on the fact that under common law fraud, corporate officers are liable for fraud if they participate in, direct, or were negligent in learning of and preventing the fraudulent conduct, citing to *Morgan v. Eaton's Dude Ranch*, 307 Minn. 280, 239 N.W.2d 761, 762 (1976). Because the Consumer Fraud Act was intended to be broader than the common law, the Act would apply to someone such as Kathryn Dygert, who owned almost half of the stock in OCC, and where there exists substantial evidence that she participated in or acquiesced in the Junior Note Mortgage program.

■ The Court finds that the law supports Plaintiff's theory of liability against Kathryn Dygert. The law is clear that the Act was intended to be broader the common law fraud cause of action, and that it is remedial in nature and should thus be liberally construed. *State by Humphrey v. Alpine Air Prods.*, 490 N.W.2d 888, 892 (Minn.Ct.App.1992) *aff'd* 500 N.W.2d 788 (Minn.1993). In this case, Kathryn Dygert has admitted that she participated, to some degree, in the perpetuation of the Junior Note Mortgage program and that she was generally aware that her husband was involved in the solicitation of funds for OCC, that he did this through the Junior Note Program, and that she was generally aware that her husband provided investors in the Junior Note Program personal guarantees. The evidence also shows that Kathryn Dygert knew enough of the Junior Note Program to express her disapproval. Kathryn Dygert Dep. at 31. Finally, it is

---

1. Investment contracts are included in the definition of security, as defined in Minn.Stat. § 80A.14, subd. 18(a).

2. While it is true that Plaintiffs cannot obtain double recovery under both the Consumer Fraud Act and the securities laws, alternative pleading is allowable.

undisputed that at the relevant times, Kathryn Dygert owned 47% of the shares in OCC. As such, Kathryn Dygert was in a position to do something about the Junior Mortgage Note program. *See,* Jerry Dygert Dep. Ex. 7, Unanimous Consent of Shareholders. Further, there is evidence showing participation in and knowledge of the program, genuine issues of fact preclude summary judgment on the Consumer Fraud act claim as to Kathryn Dygert. *See McNamara,* 26 F.Supp.2d at 1171 (summary judgment not appropriate as to Consumer Fraud Claim where material issues of fact existed regarding whether the company's agents used reasonable care in communicating information to the plaintiffs). Although she claims that she was not aware that she owned such shares, her credibility as to such an assertion is a matter for the finder of fact.

■ The Court finds that with regard to Jerry Dygert and the Dygert Law Office, genuine issues of material fact exist, precluding summary judgment with regard to the Consumer Fraud Act as to these defendants. For example, Plaintiffs have submitted evidence that Jerry Dygert was aware of the Junior Mortgage Note program and its nature. Jerry Dygert also admitted to raising concerns about the program to his father, but he never followed through with such concerns. Jerry Dygert Dep. at 56–57 and 71–73. Jerry Dygert was also a shareholder and thus, like his mother, was in a position to do something about the Junior Mortgage Note program. In addition, there is evidence that Jerry Dygert was aware that as of 1997, OCC's debt as a result of the Junior Mortgage Note program was $5 million dollars.

***Common Law Fraud***

■ Plaintiffs argue that Jerry Dygert is liable to them under common law fraud based on partnership liability and fraud by omission. Plaintiffs argue that because Robert Dygert conducted some of OCC's business on Dygert & Dygert letterhead, Jerry Dygert is liable for Robert Dygert's fraudulent conduct pursuant to Minn.Stat. § 323.12. This statute provides:

> Where, by any wrongful act or omission of any partner acting in the ordinary course of the business of the partnership, or with the authority of copartners, loss or injury is caused to any person, not being a partner in the partnership, or any penalty is incurred, the partnership is liable therefore to the same extent as the partner so acting or omitting to act.

*Id.* Defendants argue that partnership liability only extends to acts committed in the ordinary course of the partnership. As OCC business was not conducted in the ordinary course of the Dygert & Dygert law partnership, there is no partnership liability. The Court agrees. The fact that Robert Dygert may have written five letters regarding OCC business on Dygert & Dygert letterhead is not sufficient to impose partnership liability with regard to Robert Dygert's fraudulent conduct concerning OCC business.

■ Under Minnesota law, one may be liable to another for fraud by failing to disclose a material fact in certain circumstances, such as when a fiduciary relationship exists or when a disclosure is necessary to clarify misleading information already disclosed, or when one party has special knowledge of material facts to which the other party does not have access. *American Computer Trust Leasing v. Boerboom Int'l, Inc.,* 967 F.2d 1208, 1211 (8th Cir.1992)(citing *L & H Airco, Inc. v. Rapistan Corp.,* 446 N.W.2d 372, 380 (Minn.1989)). Plaintiffs assert that each of the above-described circumstances is present in this case. For example, Plaintiffs assert that Jerry Dygert had a

fiduciary relationship with those Plaintiffs that were his clients, Thomas Murphy, Irene Wilson, and David and Geraldine Meyer. Plaintiffs further assert that Jerry Dygert owed fiduciary duties to all Plaintiffs because he drafted the Security Indenture, which was intended to protect the interests of all Junior Mortgage Note holders. Plaintiffs further allege that Jerry Dygert had knowledge of OCC's failing financial condition and knew or should have known that the sale of Junior Mortgage Notes were being sold illegally as unregistered securities, yet did nothing to protect the Plaintiffs' investments.

The Court agrees that genuine issues of material fact preclude summary judgment on the common law fraud claim based on a theory of fraudulent nondisclosure.

### State and Federal Securities Law Violations

Plaintiffs allege that Jerry Dygert and the Dygert Law Office are liable for securities fraud under both state and federal law based on two events. Plaintiffs allege that Jerry Dygert committed fraud by undermining the security interests of the Junior Mortgage Note holders on behalf of his domestic partner, Donald Drapeau, and by failing to disclose to the Plaintiffs in 1997 that OCC's debt to Junior Mortgage Note holders had reached $5 million dollars, causing the Plaintiffs to not exercise their rights under the securities for the return on their investment.

Section 10b of the Securities and Exchange Act provides that it is unlawful "to use or employ, *in connection with the purchase or sale* of any security registered on a national securities exchange or any security not registered, or any securities-based swap agreement . . ., any manipulative or deceptive device or contrivance in contravention of such rules and regulations . ." (emphasis added) SEC Rule 10b–5 similarly provides that it shall be unlawful to employ a scheme to defraud, or to omit to state material facts, or to engage in any act or practice or course of business that would operate as a fraud or deceit *in connection with the purchase or sale of any security.* (emphasis added). Further, Minn.Stat. § 80A.01 also provides that it is unlawful, in connection with the offer, sale or purchase of a security to employ a scheme to defraud, or to omit to state material facts, or to engage in any act, practice or course of business that would operate as a fraud or deceit.

■ The acts that are the basis for Plaintiffs' securities fraud claims took place in 1997. With the exception of the investment made by James Murphy, as custodian for Timothy Murphy in 1998, no Plaintiffs purchased or sold their Junior Mortgage Notes on or after the dates upon which Defendants allegedly base their securities fraud claims. Therefore, such Plaintiffs do not have a § 10b or Minn. Stat. § 80A.01 claim in connection with the purchase or sale of their interest in OCC. *See, Bickhardt v. Ratner,* 871 F.Supp. 613, 618 n. 4 (S.D.N.Y.1994)(plaintiffs that had not sold or otherwise relinquished their interests did not have a 10(b) claim in connection with the sale of their interest.) Summary judgment is not appropriate as to James Murphy, as custodian for Timothy Murphy. Dismissal is appropriate, however, as to the remaining Plaintiffs.

### Conversion

■ Conversion is "an act of willful interference with a chattel, done without lawful justification, by which any person entitled thereto is deprived of use and possession." *Larson v. Archer–Daniels–Midland Co.,* 226 Minn. 315, 317, 32 N.W.2d 649, 650 (1948). Generally, "the intent, knowledge or motive of the converter is immaterial except as affecting damages." *Id.*

Plaintiffs argue that when Robert Dygert executed his personal guarantees of the Junior Mortgage Notes, those guarantees vested in Plaintiffs an interest in Robert Dygert's property. It is Plaintiffs' position that by placing all of Robert's assets in her name, Kathryn converted the Plaintiffs' interest in Robert's assets.

Plaintiffs have presented no evidence, however, that any transfer of assets from Robert to Kathryn occurred after the personal guarantees at issue were signed. The evidence shows that the couple's home has been in Kathryn's name since 1957, yet the earliest investment by one of the Plaintiffs, Thomas Murphy, did not occur until 1987. Thus, to the extent that assets were transferred prior to the execution of personal guarantee relative to a particular Plaintiff, there is no claim for conversion. Summary judgment will thus be granted to as any claim involving assets transferred prior to the execution of the personal guarantees.

### Unjust Enrichment

Unjust enrichment is an equitable doctrine used to prevent a defendant from wrongfully benefiting from fraud, mistake or moral wrongdoing against the plaintiff. *Fort Dodd Partnership v. Trooien*, 392 N.W.2d 46, 48–49 (Minn.App.1986)(citing *Cady v. Bush*, 283 Minn. 105, 110, 166 N.W.2d 358, 361–362 (1969)). "Unjust enrichment is founded on the principle that a defendant who has received money, which in equity and good conscience should have been paid to the plaintiff, should pay the money over." *Id.*

Plaintiffs contend that Kathryn Dygert was unjustly enriched because all assets and property were placed in her name in order for Robert Dygert to make hollow and fraudulent personal guarantees. Kathryn knew Robert Dygert had a habit of placing all assets in her name and she was aware that he was personally guaranteeing the substantial amount of Notes being issued. She also knew he may have been placing the assets in her name because of the personal guarantees.

Kathryn Dygert argues that there is no evidence that she set up their family finances for the purpose of avoiding Robert Dygert's personal guarantees concerning OCC. Kathryn Dygert further argues that even though she has not been employed since 1939, evidence of her ability to purchase and maintain assets is supported by her undisputed evidence of inheritance, gifts and social security payments.

The Court finds that genuine issues of material fact preclude summary judgment as to this claim. If Plaintiffs succeed in proving that Kathryn Dygert was aware of Robert's practice of putting all assets in her name, and that he did for fraudulent purposes, and that Kathryn was, in fact, benefiting from fraud, the fact finder could determine that Kathryn Dygert was unjustly enriched as a result.

### Legal Malpractice/Breach of Fiduciary Duty

Plaintiffs claim that as legal counsel for Plaintiffs, Defendant Jerry Dygert and the Dygert Law Office acted in reckless disregard of their rights. Plaintiffs focus on two instances of legal malpractice to prove their claims. First, Plaintiffs allege that Jerry Dygert gave Thomas Murphy and Irene Wilson specific advice about their OCC investments, and that he referred Irene Wilson to Robert Dygert for further investments in OCC, and that such conduct constitutes legal malpractice and a breach of fiduciary duty. Plaintiffs next allege that Jerry Dygert committed malpractice by drafting the Security Indenture on behalf of all investors in the Junior Mortgage Note program, and then later drafted a second document the effect of which defeated the rights created by the Security Indenture.

Defendants assert that these claims must be dismissed as Plaintiffs have failed to submit an expert affidavit to establish a prima facie case of legal malpractice. Defendants assert that such affidavit is required by Minn.Stat. § 544.42. Plaintiffs argue that the requirements concerning expert affidavits in legal malpractice claims are applicable only where the plaintiff chooses to use an expert to establish his/her claim. Plaintiffs asserts that they have chosen not to present expert testimony because their theory is readily understandable and capable of evaluation by the jury without the assistance of an expert.

Minn.Stat. § 544.42, subd. 2, provides that certain affidavits must be filed "[i]n an action against a professional alleging negligence or malpractice in rendering a professional service where expert testimony is to be used by a party to establish a prima facie case." The first affidavit, which must be filed with the summons and complaint and be drafted by the plaintiffs' attorney, must state one of three things: 1) that an expert has reviewed the facts of the case, whose testimony would be admissible at trial, and that such expert finds that defendants deviated from the applicable standard of care; 2) expert review could not be accomplished prior to the service of the summons and complaint because of the applicable statute of limitations; and 3) the parties have agreed to a waiver of expert review required by clause 1, or the party has applied for a waiver or modification by the court. Minn.Stat. § 544.42, subd. 3.

The second affidavit required by Minn. Stat. § 544.42, must be filed within 180 days of serving the summons and complaint, and must identify the persons that will be called as experts to testify with respect to issues of negligence, malpractice or causation. Minn.Stat. § 544.42, subd. 2(2).

Prior to the enactment of § 544.42 in 1997, Minnesota case law provided that "expert testimony is generally required to establish a standard of care applicable to an attorney whose conduct is alleged to have been negligent, and further to establish whether the conduct deviated from that standard." *Admiral Merchants Motor Freight, Inc. v. O'Connor & Hannan,* 494 N.W.2d 261, 264 (Minn.1992). Minn. Stat. § 544.42 was enacted, however, for the purpose of eliminating frivolous lawsuits, like the predecessor statute governing medical malpractice claims, Minn.Stat. § 145.682. *House v. Kelbel,* 105 F.Supp.2d 1045, 1051 (D.Minn.2000)(citing Appendix: Senate Judiciary Committee Hearing on Senate File 627, march 25, 1997, p. 3–4). In fact, § 145.682 was used as the blueprint for drafting § 544.42. *Id.* As a result, the statutory language for both statutes is, in major substance, the same. Accordingly, this Court finds that case law interpreting § 145.682 will assist the Court in determining whether § 544.42 applies in this case.

The Eighth Circuit determined that the applicability of § 145.682 to a medical malpractice case depends on a determination of whether expert testimony is necessary to establish a prima facie case, reversing a district court's dismissal of an action for failure to file expert affidavits. *Vakil v. Mayo Clinic,* 878 F.2d 238, 239 (8th Cir. 1989). In an unpublished opinion by the Minnesota Court of Appeals, the court noted that Minnesota law did recognize that expert testimony is not required "where there was no doubt about the cause of the result complained of, and the result would not have followed in the absence of a breach of duty, the establishment of which did not involve any scientific knowledge." *Way v. Foley Dental Office,* 1992 WL 43301 *3 (Minn.Ct.App.1992)(citing *Miller v. Raaen,* 273 Minn. 109, 115, 139 N.W.2d 877, 880 (1966)).

While Plaintiffs assert that its legal malpractice claims are straightforward and that an expert is not necessary for the jury to determine whether malpractice occurred, the Court disagrees. As argued by Defendants, the claims involved in this case do not involve an obviously missed deadline or a clear case of stealing client funds. Rather, the claims relate to conflicts of interest, which involves information that is not within the common knowledge of the jury. Accordingly, the Court finds that expert testimony is necessary to establish a prima facie case, and that the requirements of Minn.Stat. § 544.42 apply to this case.

Plaintiffs ask the Court for an extension to allow them time to obtain the necessary expert testimony as provided in § 544.42, subd. 4(b). This section provides:

> The parties by agreement, or the court for good cause shown, may provide for extensions of the time limits specified in subdivision 2, 3, or this subdivision....

Plaintiffs have not established good cause warranting an extension in this case. The law in Minnesota has long held that expert testimony is generally required in legal malpractice cases, and the enactment of § 544.42 did not change this requirement in any substantive way. Further, § 544.42 clearly provides that if a plaintiff seeks a waiver of the expert requirement, an application for such waiver is to be submitted with the pleadings. Plaintiffs request for an extension comes when discovery in this case is closed, and the case is to be trial ready.[3]

Plaintiffs also argue that dismissal for failure to provide the required expert affidavits is warranted only after providing Plaintiffs with 60 days notice, citing to § 544.42, subd. 6. However, that provision applies only where the plaintiff has filed a

deficient affidavit. *House*, 105 F.Supp.2d at 1054.

Based on this Court's determination that Minn.Stat. § 544.42 applies in this case, and given Plaintiffs' failure to comply with the provisions of this statute in every respect, summary judgment in favor of Jerry Dygert and the Dygert Law Office is appropriate as to these claims.

IT IS HEREBY ORDERED that:

1. Defendant Kathryn Dygert's Motion for Summary Judgment is denied in part and granted in part. Summary judgment is granted as to claims of conversion as to assets transferred prior to the execution of personal guarantees. Summary judgment as to the remaining claims is denied.

2. Defendant Jerry Dygert and the Dygert Law Office's Motion for Summary Judgment is denied in part and granted in part. Summary judgment is granted as to Plaintiffs' claims of legal malpractice, breach of fiduciary duty. Summary judgment is also granted as to all Plaintiffs' claims arising under the state and federal securities laws, with the exception of the claim asserted by James Murphy, as custodian for Timothy Murphy. Summary judgment as to all remaining claims is denied.

---

**3.** The Scheduling Order provides that discovery closed August 1, 2000, and that the case

would be trial ready November 1, 2000.