IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
November 5, 2004 Session

**DOROTHY TUCKER v. SIERRA BUILDERS ET AL.**

**Appeal from the Circuit Court for Wilson County**
**No. 11591     Clara Byrd, Judge**

_____

**No. M2003-02372-COA-R3-CV - Filed April 29, 2005**

_____

This appeal involves a dispute stemming from the shoddy construction of a modular house. The property owner filed suit in the Circuit Court for Wilson County against the contractor who constructed the house and the manufacturer of the house modules. The trial court granted a default judgment against the contractor and, following a bench trial, awarded the homeowner a $49,506.94 judgment against the manufacturer. The manufacturer has appealed. We have determined that the trial court erred when it held that the manufacturer engaged in unfair or deceptive trade practices in violation of the Tennessee Consumer Protection Act and that the manufacturer was vicariously liable for the negligence of the contractor.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed**

WILLIAM C. KOCH, JR., P.J., M.S., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., J., joined. HERSCHEL PICKENS FRANKS, P.J., filed a dissenting opinion.

James C. Bradshaw, III. and Donna L. Reed, Nashville, Tennessee, for the appellant, All American Homes.

Troy Lee Brooks, Mount Juliet, Tennessee, for the appellee, Dorothy Tucker.

**OPINION**

**I.**

Dorothy and Ray Tucker moved to Mt. Juliet, Tennessee from St. Charles County, Missouri where they had operated a trash disposal business for twenty-five years. Sometime during the late summer of 1999, they decided to build a house in Lebanon, Tennessee for their daughter and granddaughters. They discussed the project with several contractors, but they eventually settled on Sierra Builders, a Lebanon contractor who offered modular houses manufactured by All American Homes, ("All American") because their daughter had obtained a floor plan of an All American house that she liked. Sierra Builders was owned and operated by Craig Medlin.

Ms. Tucker was unimpressed with the modular house following her first meeting with an employee of Sierra Builders and a representative of All American at Sierra Builders' office in Lebanon. However, during a second visit to Sierra Builders' office several weeks later, Ms. Tucker accepted All American's invitation to tour its factory in Springfield, Tennessee to observe how the modular houses were constructed and to examine other completed model houses on display at the factory.

Ms. Tucker toured the All American factory and was especially impressed with the completed model houses on display there. During the tour, she inquired whether she could purchase an All American house directly and arrange for her own contractor to erect it. The factory representative told Ms. Tucker that All American did not sell their houses directly to the public and that she would be required to purchase a house through one of All American's authorized builders.

Several weeks after her factory tour, Ms. Tucker continued her conversations with Sierra Builders, the only contractor offering All American houses in the Lebanon area. On November 21, 1999, Ms. Tucker and Sierra Builders entered into an agreement to construct an All American modular house on the Tuckers' property in Lebanon. In addition to constructing the modular house, Mr. Medlin, on behalf of Sierra Builders, agreed to construct a garage and a front porch and to install a central heating and air conditioning system. Ms. Tucker wrote Sierra Builders a $1,000 check as a deposit on the house.

Mr. Medlin and Sierra Builders then graded and prepared the site and constructed the foundation. When the site preparation and the foundation were both completed, a crew of All American employees arrived at the site and installed the four modules that created the basic structure of the house. They were solely responsible for placing the modules on the foundation, joining the modules together, and then constructing the roof on the main structure. They completed this work in two days and then left the project, leaving the completion of the house to Mr. Medlin. Sierra Builders had the sole responsibility for (1) constructing the garage, (2) constructing the front porch, (3) finishing the interior of the house, and (4) installing the central heating and air conditioning.

Ms. Tucker began having problems with Mr. Medlin and Sierra Builders shortly after All American's crew had completed its work and left the job site. She visited the project every day and became dissatisfied because the job site was not cleaned up, the interior of the house was a "disarrayed mess," and the remaining work was not progressing. Eventually, she complained to the All American employee who had conducted her factory tour, and he promised to discuss her concerns with Mr. Medlin. Mr. Medlin became angry when All American passed along Ms. Tucker's complaints about the house.

The pace of construction picked up for several days after All American called Mr. Medlin into its office, but then the pace slowed down again. On March 21, 2000, Ms. Tucker called All American again and demanded that another crew be assigned to the project. She became angry when All American explained to her that she had contracted with Sierra Builders to construct the house and that All American would not assign its own workers to do the work that Sierra Builders had

contracted to do.[1]  All American also advised Ms. Tucker not to pay any more money to Sierra Builders until the project was completed to her satisfaction.  Notwithstanding this advice, Ms. Tucker paid Mr. Medlin another $15,698.50 on March 22, 2000, when he threatened to walk off the job if she did not pay him.  Sierra Builders worked for one or two more days and then left the job permanently.

On May 1, 2000, Ms. Tucker wrote Mr. Medlin a letter detailing the faulty and uncompleted work.  Virtually every item on the list involved work that Sierra Builders, not All American, had performed.  Ms. Tucker insisted that these items be corrected on or before May 15, 2000, but Mr. Medlin ignored the letter.  On June 8, 2000, Ms. Tucker complained to All American that the company was not "stand[ing] behind their product" and stated that she was giving the company an "opportunity to do the right thing."

Ms. Tucker's daughter and her children moved into the house notwithstanding the unfinished items.  By early 2001, structural problems stemming from the foundation and the poor drainage on the property were causing cracking and other problems in the house.  In addition, a number of electrical problems had manifested themselves in the house, as well as structural problems with the garage.  In February 2001, Ms. Tucker filed a complaint in the Circuit Court for Wilson County against All American, Sierra Builders, and Mr. Medlin.  Facing a motion by All American to dismiss her claims under Tenn. R. Civ. P. 12.02(6), Ms. Tucker filed an amended complaint in March 2002 which asserted breach of contract and Tennessee Consumer Protection Act claims against all defendants and also asserted that All American should be held vicariously liable for the defects in Sierra Builders' and Mr. Medlin's performance.

Mr. Medlin and Sierra Builders participated in the early stage of the judicial proceedings but were unheard from after October 2001 when the trial court permitted the lawyer representing them to withdraw.  Ms. Tucker tried without success to depose Mr. Medlin, and he was conspicuously absent at the bench trial conducted on July 31 and August 4, 2003.  In a final order entered on September 22, 2003, the trial court awarded Ms. Tucker a $148,520.82 judgment against Sierra Builders[2] and Mr. Medlin and a $49,506.94 judgment against All American.[3]  The trial court also

---

[1]For an additional fee, All American offered an option of having its own crews complete the interior of the house.  Ms. Tucker did not purchase this option when she purchased her house from Sierra Builders.  Accordingly, Sierra Builders, not All American, was contractually responsible for finishing the interior of the house and the other work on the project.

[2]The trial court determined that Ms. Tucker's damages amounted to $49,506.94.  This amount included work valued at $22,276.00 that had not yet been performed, $2,832.50 to reimburse Ms. Tucker for the time she had worked on the house herself, and $20,000.00 in attorney's fees.  The trial court then trebled that amount to arrive at $148,520.82.  The manner in which the trial court assessed the damages in this case has not been challenged on appeal.  Accordingly, this opinion should not be construed as approving awarding damages for work that had not been performed, for a plaintiff's own labor, or for trebling the amount of attorney's fees awarded as damages.

[3]The trial court did not treble the damages against All American.

awarded All American a $68,902.41 judgment against Sierra Builders and Mr. Medlin on its cross-claim.[4]  All American has appealed.

## II.
### MS. TUCKER'S CONSUMER PROTECTION CLAIM

We turn first to the trial court's conclusion that All American violated the Tennessee Consumer Protection Act in its dealings with Ms. Tucker.  Specifically, the trial court concluded that All American violated Tenn. Code Ann. § 47-18-104(b)(2), (3), & (12) (Supp. 2004) because it "took away the consumer's right to their own contractor" and its signs and brochures identified Sierra Builders as an "authorized" builder.  We have determined that a manufacturer's decision to sell its products only through authorized builders is not an unfair or deceptive trade practice.  We have also determined that Ms. Tucker failed to prove that All American's signs, brochures, and other representations regarding its relationship with Sierra Builders created the likelihood of confusion or misunderstanding regarding the source of its products or its connection, affiliation, or association with Sierra Builders.

### A.

With the enactment of the Tennessee Consumer Protection Act ("TCPA") in 1977,[5] Tennessee joined the growing number of states that had passed so-called "little FTC acts."  The little FTC acts were so designated because of their similarity to the provision of the Federal Trade Commission Act that outlawed unfair or deceptive trade practices.[6]  The TCPA, like the little FTC acts of many other states, explicitly provides that it is to be interpreted and construed in accordance with interpretations of 15 U.S.C.A. § 45(a)(1) by the Federal Trade Commission and the federal courts.  Tenn. Code Ann. § 47-18-115; *Ganzevoort v. Russell*, 949 S.W.2d 293, 298 (Tenn. 1997).

The TCPA was not intended to be a codification of the common law.  To the contrary, one of the express purposes of the TCPA is to provide additional, supplementary state law remedies to consumers victimized by unfair or deceptive business acts or practices that were committed in Tennessee in whole or in part.  Tenn. Code Ann. §§ 47-18-102(2), (4) -112.  Moreover, the TCPA is explicitly remedial, and Tennessee courts are therefore required to construe it liberally to protect

---

[4]In addition to awarding All American a $49,506.94 judgment on its cross-claim, it also awarded All American an additional $19,395.47 for its attorney's fees in this litigation.  The award of attorney's fees is consistent with the hold harmless provisions of the Builder/Manufacturer Sales Agreement entered into between All American and Sierra Builders in April 1999.

[5]Act of May 19, 1977, ch. 438, 1977 Tenn. Pub. Acts 1107, codified at Tenn. Code Ann. § 47-18-101 -116 (2001 & Supp. 2004).

[6]That provision, 15 U.S.C.A. § 45(a)(1) (1977), provides as follows: "Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful." While many states' little FTC acts prohibited both unfair methods of competition and unfair or deceptive acts or practices, the statutes of other states, including Tennessee's, prohibit only the second category of conduct–unfair or deceptive acts or practices. *Sherwood v. Microsoft Corp.*, No. M2000-01850-COA-R9-CV, 2003 WL 21780975, at *32 (Tenn. Ct. App. July 31, 2003) *perm. app. denied* (Tenn. Aug. 2, 2004).  *Cf.* Tenn. Code Ann. § 47-18-104(a).

consumers in Tennessee and elsewhere. Tenn. Code Ann. § 47-18-115; *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 925 (Tenn. 1998); *Morris v. Mack's Used Cars*, 824 S.W.2d 538, 540 (Tenn. 1992).

The scope of the TCPA is much broader than that of common-law fraud.[7] Under the TCPA, a consumer can obtain recovery without having to meet the burden of proof that is required in common-law fraud cases, and the numerous defenses that are available to the defendant in a common-law fraud case are simply not available to the defendant in a TCPA case. *See Smith v. Baldwin*, 611 S.W.2d 611, 616 (Tex. 1980). Misrepresentations that would not be actionable as common-law fraud may nevertheless be actionable under the provisions of the little FTC acts, including the TCPA. *See, e.g., Stutman v. Chemical Bank*, 731 N.E.2d 608, 611-12 (N.Y. 2000); *Eagle Props., Ltd. v. Scharbauer*, 807 S.W.2d 714, 724 (Tex. 1990). Claims under the TCPA are not limited to misrepresentations that are fraudulent or willful. *Smith v. Scott Lewis Chevrolet, Inc.*, 843 S.W.2d 9, 12-13 (Tenn. Ct. App. 1992). Instead, the TCPA applies to any act or practice that is unfair or deceptive to consumers. Tenn. Code Ann. §§ 47-18-104(a), -104(b)(27).[8]

In order to recover under the TCPA, the plaintiff must prove: (1) that the defendant engaged in an unfair or deceptive act or practice declared unlawful by the TCPA and (2) that the defendant's conduct caused an "ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated. . .." Tenn. Code Ann. § 47-18-109(a)(1).[9] The defendant's conduct need not be willful or even knowing, but if it is, the TCPA permits the trial court to award treble damages. Tenn. Code Ann. § 47-18-109(a)(3); *Concrete Spaces, Inc. v. Sender*, 2 S.W.3d 901, 910 n.13 (Tenn. 1999); *Holmes v. Foster Pontiac GMC, Inc.*, Shelby Law No. 9, 1989 WL 48515, at *4 (Tenn. Ct. App. May 10, 1989), *perm. app. denied*, (Tenn. Oct. 2, 1989); *Haverlah v. Memphis Aviation, Inc.*, 674 S.W.2d 297, 306 (Tenn. Ct. App. 1984).

The TCPA does not define the key terms "unfair" and "deceptive." As a result, the standards to be used in determining whether a representation is "unfair" or "deceptive" under the TCPA are legal matters to be decided by the courts. *Lavie v. Procter & Gamble Co.*, 129 Cal. Rptr. 2d 486, 491 (App. Ct. 2003); *State ex rel. Stovall v. DVM Enters., Inc.*, 62 P.3d 653, 657 (Kan. 2003); *United Labs., Inc. v. Kuykendall*, 370 S.E.2d 375, 389 (N.C. 1988); *Fisher Controls Int'l, Inc. v. Gibbons*, 911 S.W.2d 135, 139 (Tex. App. 1995). However, whether a specific representation in a particular case is "unfair" or "deceptive" is a question of fact. *Davidson v. General Motors Corp.*, 786 N.E.2d 845, 851 (Mass. App. Ct. 2003). The broad phrasing of the statute suggests that, at the very least, the terms "unfair" and "deceptive" should not be limited to a set of specific acts that can be readily

---

[7]*Lien v. Couch*, 993 S.W.2d 53, 57 (Tenn. Ct. App. 1998); *see also Boule v. Hutton*, 328 F.3d 84, 94 (2d Cir. 2003); *Streber v. Hunter*, 221 F.3d 701, 735 (5th Cir. 2000); *Meyer v. Dygert*, 156 F. Supp.2d 1081, 1086 (D. Minn. 2001); *Chandler v. American Gen. Fin., Inc.*, 768 N.E.2d 60, 65 (Ill. App. Ct. 2002); *Elder v. Fischer*, 717 N.E.2d 730, 734 (Ohio Ct. App. 1998).

[8]In addition to the two general prohibitions against unfair or deceptive acts or practices, the TCPA currently proscribes thirty-two other specific unfair or deceptive acts or practices. Tenn. Code Ann. § 47-18-104(b).

[9]The Act limits private actions to "individual" claims. Accordingly, class actions cannot be maintained under the TCPA. Tenn. Code Ann. § 47-18-109(a)(1).

catalogued in a judicial opinion or otherwise. *See Pan American World Airways v. United States*, 371 U.S. 296, 307-08, 83 S. Ct. 476, 483 (1963).

Although Tennessee courts have not had many opportunities to construe the terms "unfair" and "deceptive" under the TCPA, the Federal Trade Commission and the federal courts have developed a substantial and finely honed body of law construing these terms in the context of the FTC Act. The General Assembly has instructed us to look to the federal understanding of these terms in interpreting them in the TCPA. Tenn. Code Ann. § 47-18-115. Accordingly, we may look to the federal law defining these key terms to determine how they should be applied in this case.

The concept of deceptiveness is a broader, more flexible standard of actionable merchant misconduct than the traditional remedy of common-law fraud. A deceptive act or practice is one that causes or tends to cause a consumer to believe what is false or that misleads or tends to mislead a consumer as to a matter of fact.[10] Thus, for the purposes of the TCPA and other little FTC acts, the essence of deception is misleading consumers by a merchant's statements, silence, or actions. JONATHAN SHELDON & CAROLYN L. CARTER, UNFAIR AND DECEPTIVE ACTS AND PRACTICES § 4.2.3.1, at 118-19 (5th ed. 2001) [hereinafter UNFAIR AND DECEPTIVE ACTS AND PRACTICES].

The concept of unfairness is even broader than the concept of deceptiveness, and it applies to various abusive business practices that are not necessarily deceptive. UNFAIR AND DECEPTIVE ACTS AND PRACTICES § 4.3.3.1, at 156. In the 1994 legislation reauthorizing the Federal Trade Commission, Congress undertook to codify the Commission's policy statement on unfairness by stating that an act or practice should not be deemed unfair "unless the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." 15 U.S.C.A. § 45(n). Following the mandate of Tenn. Code Ann. § 47-18-115, we will use this description of unfairness to guide our interpretation of Tenn. Code Ann. § 47-18-104(a).[11]

To be considered "substantial," consumer injury must be more than trivial or speculative. *Tungate v. MacLean-Stevens Studios, Inc.*, 714 A.2d 792, 797 (Me. 1998); *Legg v. Castruccio*, 642 A.2d 906, 917 (Md. Ct. Spec. App. 1994). Substantial injury usually involves monetary injury or unwarranted health and safety risks. UNFAIR AND DECEPTIVE ACTS AND PRACTICES § 4.3.2.2, at 154. Consumer injury will be considered substantial if a relatively small harm is inflicted on a large number of consumers or if a greater harm is inflicted on a relatively small number of consumers. *Orkin Exterminating Co. v. FTC*, 849 F.2d 1354, 1365 (11th Cir. 1988).

---

[10]"Deceptive" connotes conduct that is apt or tends to deceive. 4 THE OXFORD ENGLISH DICTIONARY 328 (2d ed.1989). The verb "deceive" means "to cause to believe what it false; to mislead as to a matter of fact, lead into error, impose upon, delude, 'take in.'" 4 THE OXFORD ENGLISH DICTIONARY 324.

[11]Not all states use the Commission's current unfairness criteria to guide their interpretation of their own little FTC act. It is currently used in Connecticut, Maine, Maryland, Ohio, and Washington. While other states may have decided to use other criteria, we have determined that Tenn. Code Ann. § 47-18-115 requires us to use the criteria currently used by the Commission.

Even if an act or practice causes or is likely to cause substantial injury, it will not be considered unfair unless the injury is not reasonably avoidable by consumers themselves. Consumers cannot reasonably avoid injury when a merchant's sales practices unreasonably create or take advantage of an obstacle to the free exercise of consumer decision-making. Practices that unreasonably interfere with consumer decision-making include (1) withholding important information from consumers, (2) overt coercion, or (3) exercising undue influence over a highly susceptible class of consumers. UNFAIR AND DECEPTIVE ACTS AND PRACTICES § 4.3.2.3, at 155.

**B.**

We turn first to the trial court's apparent conclusion that the marketing of All American's products solely through authorized distributors or contractors is unfair. Specifically, the trial court concluded that this merchandising arrangement was unfair because it prevented consumers from purchasing All American's modules and then using their own contractor to install or construct them. We have concluded that the trial court misconstrued Tenn. Code Ann. § 47-18-104(a) and that there is nothing inherently unfair about a manufacturer's decision to restrict the sale of its products to authorized distributors.

Manufacturers are not required to sell their products directly to consumers. The law affords them substantial discretion to establish a sales and marketing system that will maximize the sale of their products. *See Electronics Communications Corp. v. Toshiba Am. Consumer Prods., Inc.*, 129 240, 245-46 (2d Cir. 1997) (observing that manufacturers must enjoy some freedom to determine how to distribute their products). A distributorship agreement[12] meets modern needs in the marketing and distribution of goods on a nation-wide or regional basis. *Lithuanian Commerce Corp. v. Sara Lee Hosiery*, 179 F.R.D. 450, 481 (D.N.J. 1998). The courts have recognized that distributorships have procompetitive benefits and that they serve legitimate business objectives. *Geneva Pharmaceuticals Tech. Corp. v. Barr Labs., Inc.*, 201 F. Supp. 2d 236, 274 (S.D.N.Y. 2002), *rev'd on other grounds*, 386 F.3d 485 (2d Cir. 2004). 1 FRANCHISING § 3.01 (stating that distributorships enable manufacturers "to maximize the sale of one or more products").

All American's marketing and distribution of its modular houses is not inherently unfair. Marketing products through approved distributors rather than directly to the public is commonplace and legal. This method of distribution and sales benefits both All American and consumers because it facilitates the distribution of, and increases the availability of, All American's products. Consumers benefit because they have a broader choice of modular home products. All American benefits because the use of authorized distributors increases its sales and profits.

All American's decision to make its product available only through authorized contractors does not inherently create a likelihood that consumers will be placed in a position where they will

---

[12]A distributorship is a business arrangement under which a manufacturer authorizes another business to sell its products exclusively or in conjunction with other products. 1 GLADYS GLICKMAN ET AL., FRANCHISING § 2.01 (Matthew Bender 2005) [hereinafter FRANCHISING]. A manufacturer may also give a distributor the exclusive right to sell products within a specified area. *Rocky Mountain Rhino Lining, Inc. v. Rhino Linings USA, Inc.*, 37 P.3d 458, 462 (Colo. Ct. App. 2001), *rev'd on other grounds*, 62 P.3d 142 (Colo. 2003); FRANCHISING §§ 2.01, 2.03[3].

be unable to avoid injury. Requiring that products be installed or erected by authorized distributors does not undermine a consumer's ability to decide whether to purchase an All American modular house. If a consumer, like Ms. Tucker, prefers to have a house constructed by a contractor of her choice, the consumer need only decide not to purchase an All American house and enter into a contract with another contractor.

When Ms. Tucker decided to purchase an All American modular house, she knew that it could only be installed by Sierra Builders, one of All American's authorized distributors. She was initially disinclined to purchase a modular house because she favored more conventional construction using a contractor of her own choice. However, she eventually decided to purchase a modular home because her daughter liked the floor plan and because she satisfied herself that a properly constructed modular home would fit her needs and her budget. All American's use of authorized distributors did not impair her ability to decide whether or not to purchase a modular house manufactured by All American, to purchase another manufacturer's modular house, or to purchase a conventionally constructed house built by a contractor of her choice. Accordingly, this record provides no factual support for concluding that All American's decision to market its modular houses through authorized distributors was an unfair act or practice proscribed by Tenn. Code Ann. § 47-18-104(a).

## C.

The trial court also determined that the conduct and statements of All American's employees to Ms. Tucker were unfair and deceptive. The court found specifically that All American violated Tenn. Code Ann. § 47-18-104(b)(2), (3), and (12). We have determined that the record contains no evidence to support a conclusion that All American has committed any of these specific unfair or deceptive acts or practices.

Tenn. Code Ann. § 47-18-104(b)(2) states that "[c]ausing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services" is an unfair or deceptive act or practice. The record contains no evidence of any act or statement by an All American employee that could have confused Ms. Tucker about the source of the modular house she purchased. It is beyond reasonable dispute that she knew that she was purchasing a modular house manufactured by All American and that she also knew that she had contracted with Sierra Builders to complete the interior of the home and to perform additional work that All American had not contracted to provide.

Tenn. Code Ann. § 47-18-104(b)(3) states that "[c]ausing likelihood of confusion or misunderstanding as to affiliation, connection or association with, or certification by, another" is an unfair or deceptive act or practice. Again, the record contains no evidence that any act or statement by All American misled Ms. Tucker about the relationship between All American and Sierra Builders. The All American employees provided truthful and accurate information to Ms. Tucker when they told her that Sierra Builders was one of its authorized contractors and that she could only purchase an All American modular house through Sierra Builders.

The record contains no evidence of any representations by All American employees regarding the quality of Sierra Builders' work. Simply identifying Sierra Builders as an authorized contractor is not tantamount to a warranty regarding the quality of Sierra Builders' work. As far as this record shows, the completed modular houses that Ms. Tucker inspected at All American's factory had not been constructed by Sierra Builders, and there is no evidence that any All American employee represented to Ms. Tucker that the quality of Sierra Builders' work would equal the quality of the construction she observed in the model houses. Providing Ms. Tucker with an opportunity to tour completed houses was simply intended to enable her to compare All American's modular houses with more conventionally built houses.

Finally, Tenn. Code Ann. § 47-18-104(b)(12) proscribes "[r]epresenting that a consumer transaction confers or involves rights, remedies or obligations that it does not have or involve or which are prohibited by law. . .." While it is not entirely clear how this provision applies to this case, the trial court could possibly have decided that All American is somehow responsible for Sierra Builders' failure to provide Ms. Tucker with the written extended warranty on All American's product. The record does not support this finding.

All American never misrepresented the existence or terms of its extended warranty. It never denied that it had issued an extended warranty on Ms. Tucker's modular house or that the warranty was fully enforceable.[13] The record contains no evidence that All American played any role in Sierra Builders' failure to deliver the warranty documents to Ms. Tucker or that Ms. Tucker ever called upon All American to honor its warranty after she discovered it. Thus, the record contains no evidence that All American ever represented to Ms. Tucker that the transaction conferred warranty rights on her that it did not, in fact, confer.

All American's signs, brochures, and tours represented that Sierra Builders was one of its authorized contractors. These representations were true. Sierra Builders was at all relevant times an authorized All American homes contractor. However, it is not reasonable to conclude that by designating Sierra Builders as an authorized contractor, All American also warranted the quality of Sierra Builders' work or agreed to be responsible for Sierra Builders' performance of its contract with its customers. Accordingly, we find that All American's truthful representations did not mislead Ms. Tucker into believing that her contract with Sierra Builders conferred rights or remedies on her that it actually did not.

### III.
### ALL AMERICAN'S VICARIOUS LIABILITY FOR SIERRA BUILDERS' PERFORMANCE

The trial court also determined that All American was liable to Ms. Tucker under the doctrine of respondeat superior. The court determined that Sierra Builders was actually acting as All American's agent and, therefore, that All American was ultimately responsible for Sierra Builders' shoddy work. The evidence does not support the trial court's conclusion that Sierra Builders was

---

[13]Even during their testimony at trial, All American employees acknowledged that Ms. Tucker's warranty would cover several of her complaints and that All American was ready and willing to honor its commitment to correct these problems.

All American's agent. In fact, the only reasonable conclusion that can be drawn from the evidence is that Sierra Builders was acting only for itself when it contracted to build Ms. Tucker's house.

## A.

The doctrine of respondeat superior permits a principal to be held liable for the negligent acts of its agents. *Johnson v. LeBonheur Children's Med. Ctr.*, 74 S.W.3d 338, 346 (Tenn. 2002); *Washington v. 822 Corp.*, 43 S.W.3d 491, 494 (Tenn. Ct. App. 2000). To hold a principal liable for the acts of another, a plaintiff must prove (1) that the person causing the injury was the principal's agent and (2) that the person causing the injury was acting on the principal's business and acting within the scope of his or her employment when the injury occurred. *Russell v. City of Memphis*, 106 S.W.3d 655, 657 (Tenn. Ct. App. 2002); *Tennessee Farmers Mut. Ins. Co. v. American Mut. Liab. Ins. Co.*, 840 S.W.2d 933, 937 (Tenn. Ct. App. 1992).

Determining whether a principal-agent relationship exists requires a careful analysis of the facts. *See Bd. of Directors of Harriman Sch. Dist. v. Southwestern Petroleum Corp.*, 757 S.W.2d 669, 673 (Tenn. Ct. App. 1988); *Knight v. Hawkins*, 26 Tenn. App. 448, 457-58, 173 S.W.2d 163, 166-67 (1943). The Tennessee Supreme Court has held that the following factors should be considered when determining whether a person is an agent or an independent contractor: (1) the right to control the conduct of the work, (2) the right of termination, (3) the method of payment, (4) the freedom to select and hire helpers, (5) the furnishing of tools and equipment, (6) the self-scheduling of work hours, and (7) the freedom to render services to other entities. *Beare Co. v. State*, 814 S.W.2d 715, 781 (Tenn. 1991).

The most indicative factor is the right to control the conduct of the work. *Youngblood v. Wall*, 815 S.W.2d 512, 517 (Tenn. Ct. App. 1991). Control is a key element in the creation of a principal-agent relationship. RESTATEMENT (SECOND) OF AGENCY § 220(1) (1958); WARREN A. SEAVEY, HANDBOOK OF THE LAW OF AGENCY § 84C (1964). However, in Tennessee, it is not the right to control the result that is determinative of the existence of an agency relationship; it is the right to control the actual conduct of the work. *McDonald v. Dunn Constr. Co.,* 182 Tenn. 213, 220, 185 S.W.2d 517, 520 (1945); *Armoneit v. Elliott Crane Serv., Inc.*, 65 S.W.3d 623, 629 (Tenn. Ct. App. 2001).

## B.

The trial court misapplied the "right to control" principle, as well as most of the other *Beare Co. v. State* factors in its analysis of the evidence in this case. It supported its conclusion that All American had "substantial control" over the work of Sierra Builders by pointing to several requirements in the "Builder/Manufacturer Sales Agreement," including Sierra Builder's obligations (1) to provide a bond, (2) to carry insurance, and (3) to comply with the terms of the sales agreement. It also relied heavily on its understanding that All American furnished Sierra Builders all of its equipment and materials and that Sierra Builders could "only be an authorized builder for All American Homes," and (3) that All American retained the right to terminate its agreement with Sierra Builders.

The evidence simply does not support the trial court's findings regarding the furnishing of tools and equipment or the exclusivity of All American's contract with Sierra Builders. All American presented uncontradicted evidence that its agreement with Sierra Builders was not exclusive. All American also presented uncontradicted evidence that it used its own equipment and crew only to secure the modules on the foundation and to place the roof on the building. While there is also evidence that All American may have sold some materials for the construction of the porch and garage, there is no evidence that All American was involved with the construction of these structures.

None of the facts relied on by the trial court amount to the sort of control over the details or the manner in which Sierra Builders performed its work needed to establish an agency relationship between All American and Sierra Builders. This record contains absolutely no evidence (1) that All American retained the right to control the means or methods of Sierra Builders' work, (2) that Sierra Builders was not free to render services to others, (3) that Sierra Builders was not free to select its own employees and helpers, (4) that Sierra Builders did not set its own work schedule and work hours, or (5) that Sierra Builders did not provide its own tools and equipment for the portions of the work for which it was responsible. It is also important to note that All American did not pay Sierra Builders anything for its work. To the contrary, Sierra Builders was required to pay All American for the house modules and the materials it purchased from All American.

After reviewing the evidence in this record in its entirety, we have concluded that Ms. Tucker has failed to prove that Sierra Builders was acting as All American's agent with regard to the construction of her house. In fact, the evidence rather convincingly establishes that Sierra Builders independently contracted with Ms. Tucker and that All American was essentially a material supplier, just like the manufacturer of the central heating and air conditioning unit that was installed in Ms. Tucker's house.

By the time this case was tried, it was evident that the real culprits, Sierra Builders and Mr. Medlin, were judgment-proof. As regrettable as this may be, it does not provide the trial court with a defensible basis for requiring All American to bear the costs of correcting Sierra Builders' shoddy work. Under the facts of this case, the neutral legal principles of respondeat superior simply will not permit holding All American vicariously liable for Sierra Builders' performance of its contract with Ms. Tucker.

**IV.**

The judgment against All American Homes is reversed, and the case is remanded to the trial court with directions to dismiss Ms. Tucker's claims against All American, to modify All American's judgment against Sierra Builders, and to take whatever further action is required. The costs of this appeal are taxed to Dorothy Tucker for which execution, if necessary, may issue.

_____
WILLIAM C. KOCH, JR., P.J., M.S.

-11-