IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
December 5, 2006 Session

# ROBERT JENKINS ET AL. v. CHASE BROWN ET AL.

**Appeal from the Chancery Court for Wilson County**
**No. 99249     C.K. Smith, Chancellor**

---

**No. M2005-02022-COA-R3-CV - Filed December 14, 2007**

---

This appeal involves a dispute regarding the liability for the structural defects in a four-year-old house in a Mt. Juliet subdivision. Shortly after purchasing the house from its original owners, the property owners discovered that the house had been constructed on improperly compacted fill and other debris. When additional structural problems manifested themselves, the property owners filed suit in the Chancery Court for Wilson County seeking compensatory and punitive damages against the contractor who built the house and his wife, the original owners, the original owners' real estate agent and broker, their own real estate agent and broker, and their home inspector. Following an eight-day trial, the jury determined that the contractor and the original owners had engaged in intentional and reckless misrepresentation by concealing the house's structural problems. The jury also determined that both real estate agents and the developer of the subdivision were at fault. The jury awarded the property owners $58,720.80 in compensatory damages to be apportioned among the parties at fault. The jury also awarded the property owners $20,000 in punitive damages against one of the original owners and $50,000 in punitive damages against the contractor. The trial court reduced the punitive damage award against the original property owner to $14,000, and granted a judgment notwithstanding the verdict for the two real estate agents with regard to the property owners' Tennessee Consumer Protection Act claims. On this appeal, the property owners take issue with the dismissal of their claims against the real estate agents and their brokers based on their use of an outdated and incomplete real property disclosure form. The contractor also takes issue with the judgments awarded against him for compensatory and punitive damages. We have determined that the trial court did not err by dismissing the property owners' claims against the real estate agents and their brokers based on the use of the incomplete and outdated disclosure form. We have also concluded that the property owners presented insufficient evidence to establish their common-law fraud claim against the contractor who built the house. Accordingly, we reverse the portion of the judgment requiring the contractor to pay compensatory and punitive damages.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part;**
**Reversed in Part; and Remanded**

WILLIAM C. KOCH, JR., P.J., M.S., delivered the opinion of the court, in which PATRICIA J. COTTRELL and FRANK G. CLEMENT, JR., JJ., joined.

Shawn J. McBrien, Lebanon, Tennessee, for the appellants, Robert Jenkins and Sharon Jenkins.

Todd A. Bricker, Nashville, Tennessee, for the appellees, Carol Palmer and Folk Jordan Company, Inc., d/b/a Folk Jordan Better Homes and Gardens.

Douglas Berry and Alvin L. Harris, Nashville, Tennessee, for the appellees, Frances Garner and Sharon Langford and Associates, Inc.

Dean Robinson, Mt. Juliet, Tennessee, for the appellee, Clarence Wright.

**OPINION**

**I.**

Clarence Wright spent roughly thirty years building houses and restaurants and renovating apartments. At various times, he was licensed as an electrical contractor and as a general contractor. After he retired in the early 1990s, Mr. Wright allowed his general contractor's license to lapse. His retirement did not last long. In 1993, he decided to purchase four lots in two adjacent subdivisions in Mt. Juliet that were being developed by K & P Developers.[1] After purchasing the lots, Mr. Wright began constructing houses for resale without renewing his general contractor's license.[2]

One of the lots Mr. Wright purchased was located at 1327 Oak Valley Drive in the Queens Valley Subdivision. The neighbors referred to the lot as the "Queen Valley Dump" because K & P Developers and others used the lot to discard debris and trash – including tree branches, wood, construction materials, and bed springs. While some effort had been made to compact the fill material and debris, much of the lot was unsuitable for construction. Mr. Wright was aware of the original condition of the lot and that the developers had filled in portions of the lot. However, K & P Developers apparently told him that the building envelope – the portion of the lot on which the house would be built – did not contain fill material and was suitable for building.

In 1993, Mr. Wright began constructing a house on the lot at 1327 Oak Valley Drive. In April 1994, he contracted to sell the house to Chase and Melinda Brown. In August 1994, shortly after the Browns moved, they began to encounter problems with the house, including problems with the duct work, problems with the plumbing, and excess moisture in the basement. They also experienced "nail pops" in the walls, and in 1995, they noticed cracking near windows on the front left of the house and on the back right of the house. Mr. Wright assured the Browns that many of these problems were caused by normal settling. He dispatched someone to repair the cracks, but the Browns decided to hire someone else to make the repairs. When those cracks reopened in 1997 and new cracks appeared, the Browns again hired someone else to make the repairs.

---

[1] K & P Developers was a joint venture of Bill Kay and Leonard Peak who were friends of Mr. Wright. K & P Developers was also referred to as "K & P Landscaping, Inc."

[2] In most circumstances, a contractor's license is required if the cost of the completed construction exceeds $25,000. Tenn. Code Ann. § 62-6-102 (Supp. 2007).

The Browns remained in constant contact with Mr. Wright regarding the problems that were plaguing their house. They were particularly concerned about the moisture in the basement. Mr. Wright never addressed all of the Browns' concerns to their satisfaction. Mr. Wright had told the Browns that the problem could be remedied by installing a French drain,[3] but he never installed the drain. Over time, the relationship between the Browns and Mr. Wright deteriorated.

Eventually, the Browns learned that Mr. Wright did not have a general contractor's license when he built their house. In May 1997, they filed a complaint against him with the Board for Licensing Contractors. They stated in their complaint that they had engaged lawyers and were considering suing Mr. Wright. As a result of the Board's investigation, Mr. Wright was fined $500 for building another house in the subdivision without a general contractor's license.[4] Mr. Wright performed some additional repair work on the Browns' house, but the work did not satisfy the Browns.

The Browns decided to sell the house in June 1998. They hired Carol Palmer, a real estate agent affiliated with Folk Jordan, Inc., to be their real estate agent. As required by the Tennessee Residential Property Disclosure Act,[5] Ms. Palmer provided the Browns with a residential property condition disclosure form and explained to them that they were statutorily required to complete this form and to provide the form to potential buyers. The Browns and Ms. Palmer do not agree regarding who filled out the form,[6] but the Browns signed the form on June 23, 1998.

The form that the Browns signed on June 23, 1998 was inaccurate or incomplete in several significant ways. The questions regarding the Browns' awareness of significant defects or malfunctions in the foundation or slab were not answered. The Browns marked "no" is response to the question "Are you aware of any . . . settling from any cause, or slippage, sliding, or other soil problems?" They also answered "no" to the question regarding whether there was any landfill on any part of the property. The Browns also failed to provide the date of the most recent survey of the property, although they did indicate that there was some dampness in the left rear of the basement.

On June 30, 1998, one week after executing the disclosure form, the Browns sued Mr. Wright and his wife in the Circuit Court for Wilson County. Their complaint described the leaks and other

---

[3]A French drain is essentially a trench filed with gravel that redirects surface and ground water away from an area.

[4]Mr. Wright was actually fined for building on another one of the lots that he had purchased from K & P Developers, but the board evidently closed the file on the Browns' complaint after issuing the fine.

[5]Tenn. Code Ann. §§ 66-5-201 to -212 (2004 and Supp. 2007).

[6]The Browns maintain that they answered the questions aloud while Ms. Palmer filled out the form. Ms. Palmer, on the other hand, insists that she merely left the form with the Browns and that they filled it out. Because the Browns do not allege fraud in the completion of the form and do not contest that they signed the form, the question of who filled out the form is irrelevant, and the Browns are bound by their answers – or lack of answers. *See Smith v. Tenn. Farmers Life Reassurance Co.*, 210 S.W.3d 584, 591 (Tenn. Ct. App. 2006).

problems with the home and alleged that Mr. Wright had acted negligently and fraudulently. They requested $50,000 in compensatory damages and $100,000 in punitive damages.[7]

A revised version of the Residential Property Disclosure Act became effective on July 1, 1998,[8] eight days after the Browns had executed their disclosure form. The new law required additional disclosures from the sellers of real property. Specifically, the new law required sellers to disclose "any lawsuits or proposed lawsuits by or against the seller which affects or will affect the property." Ms. Palmer did not advise the Browns of the new law and did not ask them to complete a new disclosure form. Consequently, the Browns' June 23, 1998 disclosure form did not alert prospective buyers about the Browns' suit against Mr. Wright.

Sometime between July 1 and July 3, 1998, Sharon Jenkins, accompanied by Frances Garner, her real estate agent who was affiliated with Sharon Langford and Associates, visited the Browns' house. Ms. Jenkins liked the property and encouraged her husband, Robert Jenkins, to tour the house himself. Mr. Jenkins toured the house on July 4, 1998, and made an offer which the Browns accepted.

On July 8, 1998, the Jenkinses received a copy of the Browns' June 23, 1998 disclosure form. They did not inquire about the missing answers on the form. Ms. Garner did not call the missing answers to the Jenkinses' attention, nor did Ms. Palmer. Apparently, neither Ms. Garner nor Ms. Palmer realized that the disclosure form did not comply with the version of the Residential Property Disclosure Act then in effect. If they did, they did not mention it to either the Browns or the Jenkinses.

Acting on Ms. Garner's advice, the Jenkinses hired Ken Semple to inspect the Browns' house. Mr. Semple inspected the house on July 11, 1998 in the company of Mr. Jenkins and Mr. Brown. When Mr. Semple found a crack in the foundation, Mr. Brown told him that it had been caused by settling during the first year and that it had been repaired. Mr. Brown failed to mention that the cracks had re-opened in 1997, necessitating further repairs. Following Mr. Semple's inspection, Ms. Garner went over the inspection report with her clients, and the Jenkinses negotiated with the Browns regarding repairs they wanted made to the house prior to closing the sale.[9]

The Jenkinses' purchase of the house from the Browns was completed on August 8, 1998. Within one week after moving in, Ms. Jenkins noticed a crack adjacent to the bay window near the kitchen. Soon thereafter, Mr. Jenkins noticed cracks on the outside of the house. When the Jenkinses expressed their concern to Ms. Garner, she suggested that they hire a structural engineer. The Jenkinses retained Ron Jones who inspected the house on September 8, 1998, and concluded that settling and cracking was occurring because the footers had not been placed deeply enough into

---

[7]The Browns eventually settled this lawsuit for approximately $2,200.

[8]Act of April 8, 1998, ch. 727, sec. 1, 1998 Tenn. Pub. Acts 320.

[9]Although the Jenkinses were dissatisfied with many of the repairs that the Browns made prior to the close of sale, none of those repairs are at issue in this case.

the ground. He recommended that the house's foundation be reinforced with steel pipe at a cost of approximately $18,200.

The Jenkinses did not undertake these repairs because they were too expensive. They continued to live in the house even though they noticed that the cracks were widening with the passage of time. On June 2, 1999, the Jenkinses filed suit in the Chancery Court for Wilson County against the Browns, Ms. Palmer and her broker, Ms. Garner and her broker, and Mr. Semple. After the Browns' answer pointed the finger of culpability at Mr. Wright, the Jenkinses amended their complaint to add a common-law fraud claim against Mr. Wright and his wife.

After the Jenkinses had filed their lawsuit, their neighbors told them that their property had been known as the "Queen Valley Dump." Fearing that their house was built on a landfill, the Jenkinses asked Mr. Jones to perform additional tests. Mr. Jones returned to the house on October 18, 1999. After digging test pits near the locations of foundation cracks, Mr. Jones discovered that the footers, which were located 1.5 feet below ground level, were sitting on "firm but not stiff" clay. At 6 feet below ground level, Mr. Jones discovered construction debris mixed with clay. At 7.5 to 9 feet below ground level, Mr. Jones found fill material that was unsuitable for building. Based on his findings, Mr. Jones increased his estimated cost of repair to approximately $39,000.

Once again, the Jenkinses decided against repairing the house. They lived in the deteriorating conditions[10] until January of 2001, when they purchased another home for $210,000. The Jenkinses paid the mortgages on both homes for three years, but eventually they lost the Oak Valley property through foreclosure.

The matter proceeded to an eight-day jury trial from March 14-23, 2005. In addition to the parties, Mr. Jones and the Jenkinses' neighbors testified.[11] The Jenkinses also submitted the expert testimony of Marbutt Gaston, a real estate agent, who testified without objection regarding the standards of conduct expected of real estate agents. The trial court granted a partial directed verdict for Ms. Garner, Ms. Palmer, and their brokers at the close of the Jenkinses' case-in-chief. While the court concluded that Ms. Garner and Ms. Palmer had breached their duty to see to it that a proper real estate disclosure form was used, the court determined that the Jenkinses had failed to establish that the failure to use the correct disclosure form had caused them damage. However, the trial court declined to direct a verdict on the Jenkinses' negligence claim based on the agents' failure to obtain answers on the disclosure form regarding the foundation and the settling.

Mr. Wright also sought a directed verdict at the close of the Jenkinses' case on the ground that their claims were time-barred and because they had failed to prove that he knew that the house had been constructed on a landfill. The trial court denied Mr. Wright's motions.

[10]Ms. Jenkins described the house as having various popping and creaking, windows pulling away from the wall, drafts, water coming in the windows when it rained, high utility bills, twisting kitchen floors, and a garage rendered unuseable because of the fear of bricks falling off the side of the sinking house.

[11]Defendant Ken Semple died before trial.

The jury returned a verdict in favor of the Jenkinses against most of the defendants. The jury found that the Browns and Mr. Wright engaged in intentional and reckless misrepresentation and misrepresentation by concealment. The jury found that Ms. Palmer and her broker and Ms. Garner and her broker were guilty of negligence. The jury also found non-party K & P Developers to be at fault.[12]

The jury awarded the Jenkinses $58,720.80 in compensatory damages. The jury also found that Ms. Palmer and Ms. Garner had violated the Tennessee Consumer Protection Act by failing to require the Browns to complete the new disclosure form. Finally, the jury determined that the Jenkinses were entitled to $20,000 in punitive damages from Mr. Brown and $50,000 from Mr. Wright. The trial court later reduced the award of punitive damages against Mr. Brown to $14,000 and granted judgments notwithstanding the verdict to Ms. Palmer, Ms. Garner, and their Realtors on the Jenkinses' consumer protection claims.

The Jenkinses take issue on this appeal with the directed verdict dismissing their claim based on the negligent use of the incorrect real property disclosure form and with the judgment notwithstanding the verdict dismissing their consumer protection claims against Ms. Palmer, Ms. Garner, and their brokers. For his part, Mr. Wright takes issue with the trial court's conclusion that the Jenkinses' claims against him were not time-barred and with the award of compensatory and punitive damages.

## II.
### THE TENN. R. CIV. P. 50.01 AND 50.02 DISMISSAL OF THE JENKINSES' CLAIMS AGAINST THE REAL ESTATE AGENTS AND THEIR BROKERS

The Jenkinses asserted three claims against Ms. Palmer, Ms. Garner, and their brokers. First, they claimed that these defendants were negligent because they failed to require the Browns to fully answer all the questions on the disclosure form. Second, they claimed that these defendants were negligent because they did not require the Browns to complete the most current version of the real property disclosure form which would have required the Browns to disclose their lawsuit against Mr.

---

[12]The jury allocated fault as follows:

| | |
|---|---|
| Robert and Sharon Jenkins | 0% |
| Chase Brown | 5% |
| Melinda Brown | 5% |
| Clarence Wright | 35% |
| Wilma Wright | 0% |
| Carol Palmer, as agent of Folk Jordan | 10% |
| Frances Garner, as agent of Sharon Langford & Assocs. | 10% |
| Ken Semple | 0% |
| K & P Landscaping, Inc. | 35% |

Wright.[13]   Third, they claimed that these defendants' failure to use the correct disclosure form violated the Tennessee Consumer Protection Act.

The trial court permitted the first claim to go to the jury, and the jury determined that the real estate agents were negligent and assessed ten percent of the fault to them.  The trial court did not permit the second claim to go to the jury but rather granted a directed verdict at the close of the Jenkinses' proof.  The trial court permitted the third claim to go to the jury but then, after the jury found that the real estate agents and their brokers had violated the Tennessee Consumer Protection Act, granted a judgment notwithstanding the verdict on the claim.  This appeal involves only the latter two claims.[14]

## A.
## The Standard of Review

Directed verdicts under Tenn. R. Civ. P. 50.01 and judgments notwithstanding the verdict[15] under Tenn. R. Civ. P. 50.02 are reviewed using the same standard of review.  *Holmes v. Wilson*, 551 S.W.2d 682, 685 (Tenn. 1977); *Mairose v. Fed. Express Corp.*, 86 S.W.3d 502, 511 (Tenn. Ct. App. 2001); *Kaley v. Union Planters Nat'l Bank*, 775 S.W.2d 607, 611 (Tenn. Ct. App. 1988).  They are appropriate only when reasonable minds cannot differ as to the conclusions to be drawn from the evidence.  *Alexander v. Armentrout*, 24 S.W.3d 267, 271 (Tenn. 2000); *Eaton v. McLain*, 891 S.W.2d 587, 590 (Tenn. 1994); *Ingram v. Earthman*, 993 S.W.2d 611, 627 (Tenn. Ct. App. 1998).  A case should not be taken away from the jury, even when the facts are undisputed, if reasonable persons could draw different conclusions from the facts.  *See Gulf, M. & O.R. Co. v. Underwood*, 182 Tenn. 467, 474, 187 S.W.2d 777, 779 (1945); *Hurley v. Tenn. Farmers Mut. Ins. Co.*, 922 S.W.2d 887, 891 (Tenn. Ct. App. 1995).  A trial court may, however, direct a verdict with regard to an issue that can properly be decided as a question of law because deciding purely legal questions is the court's responsibility, not the jury's.

---

[13]Ms. Palmer and her broker argue on appeal, apparently for the first time, that the Jenkinses' complaint does not contain a negligence claim based on their negligent failure to require the Browns to complete an updated disclosure form.  We find no merit in this argument.  Viewing the Jenkinses' complaint under Tenn. R. Civ. P. 8.01's lens, we see that they alleged that Ms. Palmer "had an obligation to use reasonable care or competence in obtaining and communicating information" about the property and that she "did not use reasonable care" in doing so.  They also alleged that Ms. Palmer did not "ask the [s]ellers the proper questions about the property," that they relied on the "faulty information," and they suffered damage as a result of these actions.  Even though the Jenkinses' claims against Ms. Palmer and her broker were not as specific as the claims against Ms. Garner and her broker, we have determined that they are broad enough to include a claim for the negligent failure to require the Browns to complete an updated disclosure form.

[14]Ms. Palmer, Ms. Garner, and their brokers have not taken issue with the judgment based on their failure to require the Browns to fully complete the real property disclosure form.

[15]Lawyers with any amount of experience know that a "judgment notwithstanding the verdict" is the popular, if dated, reference to a post-trial "motion for a judgment in accordance with a motion for directed verdict."

In appeals from a directed verdict, the reviewing courts do not weigh the evidence, *Conatser v. Clarksville Coca-Cola Bottling Co.*, 920 S.W.2d 646, 647 (Tenn. 1995); *Benton v. Snyder*, 825 S.W.2d 409, 413 (Tenn. 1992), or evaluate the credibility of the witnesses. *Benson v. Tenn. Valley Elec. Coop.*, 868 S.W.2d 630, 638-39 (Tenn. Ct. App. 1993). Instead, they review the evidence in the light most favorable to the motion's opponent, give the motion's opponent the benefit of all reasonable inferences, and disregard all evidence contrary to that party's position. *Alexander v. Armentrout*, 24 S.W.3d at 271; *Eaton v. McLain*, 891 S.W.2d at 590; *Smith v. Bridgestone/Firestone, Inc.*, 2 S.W.3d 197, 199 (Tenn. Ct. App. 1999).

## B.
### The Directed Verdict on the Claim Regarding the Failure to Use the Updated Disclosure Form

The Jenkinses' negligence claim against Ms. Palmer, Ms. Garner, and their brokers arising out of their negligent failure to require the Browns to complete the updated disclosure form caused the trial court great consternation. The Jenkinses' theory was that they would not have sustained financial injury had the Browns truthfully answered the question on the revised real property disclosure form regarding the existence of "[a]ny lawsuits or proposed lawsuits by or against the seller which affects or will affect the property"[16] because this information would have prompted them not to purchase the property. However, at trial, neither Ms. Jenkins nor Mr. Jenkins testified that they would not have purchased the house had they been informed of the Browns' lawsuit against Mr. Wright. They were never even asked the question.

Ms. Garner testified that had she been aware of the Browns' complaint to the contractor's licensing board, she would have asked the Jenkinses "[if] they want[ed] to go through with it [the purchase] or if they wanted to perhaps think a little more about it." She also testified that if she had been aware of the Browns' lawsuit against Mr. Wright, she '[w]ould have wanted to know what it [the lawsuit] involved, if it would have made allegations of fraud and deceit."

Mr. Jenkins testified that he "relied on the disclosure form," but he never testified that he would not have gone through with the transaction had the existence of the Browns' lawsuit against Mr. Wright been disclosed to him. Ms. Jenkins is the only witness who even remotely touched on this subject. During cross-examination by the Browns' lawyer, she testified:

> Yes, we were suing on the disclosure. . . . But again, it wasn't disclosed to us that there were problems with this house, that the repairs had been done numerous times, the walls had cracked. That's our basis. And the landfill.

---

[16]At trial, the Jenkinses' lawyer attempted to introduce the updated disclosure form through a real estate broker who was testifying as an expert witness regarding the duties of real estate agents. Regrettably, the form that the lawyer introduced as Exhibit 8 was not the updated disclosure form. The expert pointed out this oversight and then testified regarding the correct substance of the updated form. Tenn. Code Ann. § 66-5-210 (2004) contains the correct substance of the disclosure form. The question at issue on this appeal is Question 19.

Later in the cross-examination, Ms. Jenkins made the point that she and her husband did not know the true "as is" condition of the house because this condition was not disclosed to them. She testified:

> This says purchase "as is." We never knew what "as is" was. They knew a lot about that property they never disclosed. And per our agent's deposition, we never would have bought that house had we known. She wouldn't have allowed us to. So we did not know what "as is" is. If they're going to say now it was bought "as is." We had an inspection to help us determine that. We had an agent to help us determine.[17]

At the close of the Jenkinses' case-in-chief, Ms. Palmer, Ms. Garner, and their brokers moved for a directed verdict with regard to the claims based on the failure to require the Browns to complete the updated disclosure form. Earlier in the proceeding, the trial court had determined that the real estate agents had a duty to assure that the proper disclosure forms were used and that they had deviated from the applicable standard of care by failing to require the Browns to fully answer the updated form.[18] The basis of the real estate agents' motions for directed verdict was that the Jenkinses had failed to prove that the Browns' failure to complete the updated form had caused them damage.

During lengthy arguments on the motions, the Jenkinses' lawyer insisted that had his clients been aware of the Browns' lawsuit against Mr. Wright, they would have obtained a copy of the complaint and would have learned of the Browns' numerous problems with the house, as well as the Browns' complaint to the contractors' licensing board about Mr. Wright. The trial court finally instructed the Jenkinses' lawyer to review the record of the proceedings with the court reporter and to provide the court with the record of the testimony of either Ms. Jenkins or Mr. Jenkins that they would not have purchased the house had they been aware of the Browns' lawsuit against Mr. Wright.

After reviewing the record, the Jenkinses' lawyer could point to no testimony by his clients either that they would have obtained copies of the Browns' lawsuit against Mr. Wright or that they would have declined to purchase the house had they known about the Browns' complaint. Accordingly, the trial court determined that the Jenkinses had failed to prove that the failure to use the updated disclosure form had damaged the Jenkinses and awarded a directed verdict to Ms. Palmer, Ms. Garner, and their brokers.

In reviewing the trial court's decision to grant the directed verdict, we must view the evidence, such as it is, in the light most favorable to the Jenkinses. We are not, however, required to shine the light so brightly that it obscures what the evidence actually is. Giving the testimony of

---

[17]The quotation marks around "as is" in the quotation have been added for the sake of clarity.

[18]The trial court had previously rejected the real estate agents' argument that they did not have a duty to require the Browns to complete the updated disclosure form because they had not been provided copies of the updated form by the Tennessee Association of Realtors.

the Jenkinses and Ms. Garner the most charitable construction in favor of the Jenkinses, we agree with the trial court's conclusion that any reasonable person viewing the record would conclude that the Jenkinses failed to prove that the real estate agents' negligent failure to require the Browns to complete the updated real estate disclosure form caused them any damage. At most, the testimony relates to the Browns' failure to disclose their repeated repairs of the cracks in the interior and exterior walls, the popping nails, and other similar problems.

## C.
## The Judgment Notwithstanding the Verdict on the Jenkinses' Tennessee Consumer Protection Act Claim

The Jenkinses also asserted that Ms. Palmer, Ms. Garner, and their brokers violated the Tennessee Consumer Protection Act[19] by failing to require the Browns to complete the updated real property disclosure form. They claimed that this omission was an "unfair or deceptive act or practice" prohibited by the catch-all provisions found in Tenn. Code Ann. § 47-18-104(a), (b)(27).[20] While Ms. Palmer, Ms. Garner, and their brokers insisted that they were not legally required to use the updated form for this transaction, they did not dispute that the Browns had not been asked to complete the updated form.

The trial court denied Ms. Palmer's, Ms. Garner's, and their brokers' motions for directed verdicts at the close of the Jenkinses' case-in-chief and at the close of all the evidence. The jury found that Ms. Palmer and Ms. Garner had violated the Tennessee Consumer Protection Act. However, the trial court granted their Tenn. R. Civ. P. 50.02 motions for a judgment notwithstanding the verdict regarding this claim. The trial court's July 18, 2005 order recites that the "[p]laintiffs failed to prove, by a preponderance of the evidence, that [d]efendants' negligent acts constituted unfair or deceptive trade practices." On this appeal, the Jenkinses assert that the trial court applied an incorrect legal standard when it granted the judgment notwithstanding the verdict and that their evidence made out a jury question on their consumer protection claims. We concur with their first point but not with their second.

Ruling on a motion for a judgment notwithstanding the verdict is not an occasion to weigh the evidence. *Conatser v. Clarksville Coca-Cola Bottling Co.*, 920 S.W.2d at 647. The court's role is limited to reviewing the evidence to determine whether the moving party is entitled to a judgment as a matter of law. The moving party is entitled to a judgment as a matter of law only when the evidence, viewed in the light most favorable to the opposing party, will permit reasonable persons to reach only one conclusion. *Johnson v. Tenn. Farmers Mut. Ins. Co.*, 205 S.W.3d 365, 370 (Tenn. 2006); *Childress v. Currie*, 74 S.W.3d 324, 328 (Tenn. 2002). The language in the July 18, 2005 order referring to the "preponderance of the evidence" reflects that the trial court committed error

---

[19]Tenn. Code Ann. §§ 47-18-101 to -128 (2001 & Supp. 2007).

[20]The real estate agents and their brokers asserted that the Jenkinses did not plead this claim with the required particularity. Tenn. R. Civ. P. 9.02; *Harvey v. Ford Motor Credit Co.*, 8 S.W.3d 273, 275-76 (Tenn. Ct. App. 1999). Even though the Jenkinses mis-cited the sections of the Tennessee Consumer Protection Act on which they based their claim, we have determined that they pled their consumer protection claim with sufficient particularity.

by weighing the evidence. However, notwithstanding this error, we can address the question regarding Ms. Palmer's, Ms. Garner's, and their brokers' entitlement to a summary judgment using the correct standards. We have determined that the trial court reached the correct result even if its reasoning was flawed.[21]

The Tennessee Consumer Protection Act applies to the acts or practices of real estate brokers and agents in the context of a sale of real property. *Ganzevoort v. Russell*, 949 S.W.2d 293, 297 (Tenn. 1997). However, the Act does not impose strict liability on real estate brokers and agents, *Ganzevoort v. Russell*, 949 S.W.2d at 299, and it does not necessarily apply to each and every act that might take place during a real estate transaction. Thus, it is possible that in any particular transaction, the Act will apply to some conduct but not to other conduct.

Consistent with its remedial purpose, the Tennessee Consumer Protection Act is broadly worded. The phrase "unfair or deceptive act" had not been statutorily defined in order to provide needed flexibility to develop a body of law consistent with the application of the Federal Trade Commission Act. *Tucker v. Sierra Builders*, 180 S.W.3d 109, 116 (Tenn. Ct. App. 2005). The standards for determining whether a particular act or practice is unfair or deceptive are legal matters addressed to the courts; while determinations of whether a particular act or practice is unfair or deceptive are addressed to the triers-of-fact. *Tucker v. Sierra Builders*, 180 S.W.3d at 116.

An act is deceptive if it causes or tends to cause a consumer to believe something that is false or that misleads or tends to mislead a consumer with regard to a matter of fact. *Tucker v. Sierra Builders*, 180 S.W.3d at 116. An act is unfair if it causes or is likely to cause substantial injury to consumers that is not reasonably avoided by the consumers themselves. *Tucker v. Sierra Builders*, 180 S.W.3d at 116-17. An injury is not reasonably avoidable if the actor's conduct unreasonably interferes with the consumers' decision-making by withholding important information the actor had a duty to disclose. *Tucker v. Sierra Builders*, 180 S.W.3d at 117.

The Tennessee Consumer Protection Act permits recovery for some acts or practices that are not fraudulent or willful misrepresentations. *Smith v. Scott Lewis Chevrolet, Inc.*, 843 S.W.2d 9, 12-13 (Tenn. Ct. App. 1992). But it does not necessarily follow that evidence of actionable fault (guilty intent or knowledge) is never required. The Tennessee Supreme Court has noted that the Act does not establish a single standard applicable in all cases for determining whether an act or practice is unfair or deceptive. After reviewing Tenn. Code Ann. § 47-18-104(b), the court observed that "though in most situations actionable fault is not a prerequisite to liability, in others, knowledge is a prerequisite, and in still others, intent to deceive is the standard." *Ganzevoort v. Russell*, 949 S.W.2d at 300.

The contours of the Jenkinses' consumer protection claims against Ms. Palmer, Ms. Garner, and their brokers are quite malleable. They first claimed that Ms. Palmer, Ms. Garner, and their

---

[21]The Court of Appeals may affirm a judgment on different grounds that those relied on by the trial court when the trial court reached the correct result. *Continental Cas. Co. v. Smith*, 720 S.W.2d 48, 50 (Tenn. 1986); *Shutt v. Blount*, 194 Tenn. 1, 8, 249 S.W.2d 904, 907 (1952); *In re Estate of Jones*, 183 S.W.3d 372, 378 n.4 (Tenn. Ct. App. 2005); *Shoemake v. Omniquip Int'l, Inc.*, 152 S.W.3d 567, 577 (Tenn. Ct. App. 2003).

brokers, motivated by their financial interest in completing the sale, purposely withheld and concealed important information about the house from them. When they realized they were going to be unable to prove that either Ms. Palmer or Ms. Garner knew about the problems with the house or the Browns' lawsuit against Mr. Wright, the Jenkinses modified their consumer protection claim to fit the fact that neither Ms. Palmer nor Ms. Garner had required the Browns to complete the updated disclosure form.

In response to this version of the Jenkinses' consumer protection claim, Ms. Palmer and Ms. Garner testified that they customarily did not begin using new forms until they received them from the Tennessee Association of Realtors. This response prompted the Jenkinses' lawyer to argue in response to the motion for directed verdict that "that's not a proper practice or business practice and it's at least unfair if not deceptive." However, the Jenkinses' lawyer also conceded that "they're [the real estate agents] obligated by the . . . Tennessee Consumer Protection Act, to exercise good faith in disclosing to prospective purchasers material facts affecting the value of the property known to them and not known to or reasonable [sic] ascertainable by a perspective [sic] purchaser."

There is no evidence in this record that either Ms. Palmer or Ms. Garner were aware of the Browns' problems with the house between 1994 and 1998 or of the fact that the Browns had filed an administrative complaint and a lawsuit against Mr. Wright based on numerous alleged instances of faulty construction. There is likewise no evidence that Ms. Palmer or Ms. Garner decided not to require the Browns to complete the updated real property disclosure form because they had a financial interest in closing the sale of the Browns' house. While the decision to wait to use updated statutorily mandated disclosure forms until they were provided by a professional association might have been negligent, as the trial court found, it was not done for the purpose of withholding important information about the house that either real estate agent had a duty to disclose. Accordingly, while the trial court chose the wrong analytical path, it arrived at the correct result when it granted the judgment notwithstanding the verdict and dismissed the Jenkinses' consumer protection claims against Ms. Palmer, Ms. Garner, and their brokers.

## III.
### THE JUDGMENT FOR COMPENSATORY AND PUNITIVE DAMAGES AGAINST MR. WRIGHT

Mr. Wright also takes issue with the judgment against him for both compensatory and punitive damages. He asserts (1) that the trial erred by not directing a verdict in his favor based on the four-year statute of repose in Tenn. Code Ann. § 28-3-202 (2000), (2) that the Jenkinses failed to present material evidence that he had intentionally or recklessly misrepresented the condition of the property upon which he had built the house, and (3) that the award of punitive damages against him was excessive. We have determined that the evidence supports the trial court's conclusion that Mr. Wright could not take advantage of the four-year statute of repose in Tenn. Code Ann. § 28-3-202. However, we have also determined that the record does not contain material evidence to substantiate the Jenkinses' common-law fraud claim against Mr. Wright. Accordingly, the judgment against him for compensatory and punitive damages must be reversed.

### A.

Mr. Wright is an experienced residential contractor. He was familiar with the lot at 1327 Oak Valley Drive before he purchased it from the developers in 1993. He knew that there had been a ravine or deep gully on the lot before the development began, and he was aware that the developers had placed fill on the back and front portions of the lot before he purchased it. When Mr. Wright decided to purchase the lot, he and one of the developers sited the location of the house on the property, and the developer assured him that the pad where the house would be built had been properly compacted. Mr. Wright had no reason to doubt the developer and had even seen compacting equipment on the lot.

Mr. Wright was planning to build a home with a basement. When he began the excavations for the basement and foundation, he encountered a small tree limb close to the surface and then some fill material. As a result of this discovery, Mr. Wright moved the foundation of the house between four and five feet to the north. He proceeded with the construction when the new excavations uncovered no other unusual or problematic soil conditions.

Mr. Wright decided to use a different approach to constructing the foundation. He had experienced settling and water problems with another basement home he had constructed using concrete block foundations. He had also observed the use of poured concrete stem walls in Pittsburgh. After the excavations for this house revealed the fill material, he decided to build the stem walls and foundations using poured concrete and rebar rather than concrete block. As a result, the footers on the house were wider than usual, and he used fifty-five cubic yards of concrete on the project rather than the customary fifteen cubic yards.

One of the neighboring property owners, who also had experience in residential construction, watched Mr. Wright's foundation work with some interest. He was curious about the large foundation walls that Mr. Wright was constructing and apparently walked over to the job site one day to ask Mr. Wright about it. According to the neighbor, Mr. Wright told him that he knew the developer and that "the reason he was putting that wide of footers in, [was because] he didn't want the house to go anywhere."

Soon after Mr. Wright sold the house to the Browns in 1994, the Browns began to notice cracks in the walls, nail-popping, and other signs of settling. They asked Mr. Wright to examine the problems, and after Mr. Wright inspected the house, he told them that it was not uncommon for a new house to settle within the first few years after completion and that they did not have a serious problem. He also told them that the house had been constructed on "original dirt." Apparently Mr. Wright undertook to make several cosmetic repairs. As the Browns became increasingly dissatisfied with the house, they found it more difficult to contact Mr. Wright, and they decided to have the needed repairs performed by others. Eventually, the Browns sued Mr. Wright to recover the costs of these repairs. The Browns later agreed to dismiss the suit after Mr. Wright agreed to pay them approximately $2,200 – the cost of the disputed French drain.

When the Browns began negotiating with the Jenkinses about the sale of the house, the Browns did not disclose any of the problems they had been having with the house or the disputes and litigation with Mr. Wright. The only information that the Jenkinses had regarding the construction and condition of the house was the information provided by the Browns in the real

property disclosure form and the information provided by their home inspector and the inspector retained by the lender. The Jenkinses never talked to Mr. Wright about the house.

**B.**

Mr. Wright first insists that the trial court erred by failing to direct a verdict in his favor because the Jenkinses's complaint was barred by the four-year statute of repose in Tenn. Code Ann. § 28-3-202.[22] While the Jenkinses concede that their suit was filed more than fours years after the substantial completion of the house, they insist that Mr. Wright cannot take advantage of the four-year statute of repose in Tenn. Code Ann. § 28-3-202 because he was guilty of fraud in connection with the construction of the improvement. Tenn. Code Ann. § 28-3-205(b) (2000). Thus, the pivotal question here is whether the Jenkinses presented sufficient evidence to support the conclusion that Mr. Wright was guilty of fraud in connection with the construction of the house.

While the language of Tenn. Code Ann. § 28-3-205(b) has not been subjected to frequent interpretation by the courts, the Tennessee Supreme Court has made it clear that the statute can only be triggered by fraud involving the construction of the improvement. *Chrisman v. Hill Home Dev., Inc.*, 978 S.W.2d 535, 538, n.5 (Tenn. 1998). While fraudulent concealment of a cause of action will toll the running of the applicable statute of limitations, fraudulent concealment of a cause of action is not the sort of "fraud" that will trigger Tenn. Code Ann. § 28-3-205(b).

The Jenkinses' theory of recovery against Mr. Wright was that he had fraudulently concealed from the Browns that the house had been constructed on improperly compacted fill material and that the nail-popping and the cracking in the interior and exterior walls were caused by settling resulting from the poorly compacted fill under the house. Mr. Brown testified that when problems first appeared, Mr. Wright assured him that there were no serious problems with the house and that the house had been constructed on "original dirt." Mr. Wright admitted that he did not tell the Browns that portions of the lot had been filled in or that he had moved the original location of the house after uncovering some fill material. However, he insisted that the house had been properly sited and properly constructed. The jury specifically determined that Mr. Wright "did engage in fraud, as defined by the Court, as intentional or reckless misrepresentation or misrepresentation by concealment."

When the evidentiary foundation of a jury's verdict has been approved by the trial court, Tenn. R. App. P. 13(d) limits the role of the appellate courts to determine whether the record contains sufficient material evidence to support the verdict. *See, e.g.*, *Reynolds v. Ozark Motor Lines, Inc.*, 887 S.W.2d 822, 823 (Tenn. 1994). Based on our review of the record, we have concluded that it contains sufficient material evidence to support the jury's conclusion that Mr. Wright had committed "fraud" with regard to his dealings with the Browns by concealing the extent to which fill material had been used on the lot and by asserting that the house had been constructed

---

[22]He also takes issue with the trial court's decision to deny a directed verdict based on the three-year statute of limitations for real property in Tenn. Code Ann. § 28-1-105 (2000). This issue has little merit because it is clear that the Jenkinses filed their suit within three years after discovering the structural problems with the house, as well as those who were responsible.

on "original dirt." This conduct amounts to "fraud . . . in performing the . . . construction of" the house for the purpose of Tenn. Code Ann. § 28-3-205(b). Therefore, Mr. Wright was not entitled to assert the four-year statute of repose in Tenn. Code Ann. § 28-3-202 in this case.

## C.

Mr. Wright also takes issue with the jury's conclusion that he had committed common-law fraud against the Jenkinses. He insists that the jury's verdict is not supported by material evidence because the Jenkinses presented no proof that they ever talked with him when they were deciding whether to purchase the house. He argues that a finding that he committed fraud against the Jenkinses cannot stand without evidence that he made any representations directly to the Jenkinses upon which they reasonably relied. The Jenkinses insist that the evidence regarding Mr. Wright's dealings with the Browns provides sufficient evidence to support their claim that Mr. Wright had committed common-law fraud that had caused them damage. Mr. Wright has the better argument.

It is important to note at the outset of this discussion that the "fraud" that is relevant with regard to the application of Tenn. Code Ann. § 28-3-205(b) is different from the Jenkinses' common-law fraud claim. In the context of Tenn. Code Ann. § 28-3-205(b), the fraud necessary to prevent a defendant from invoking the four-year statute of repose in Tenn. Code Ann. § 28-3-202 need not be made directly to the plaintiff. The same is not necessarily the case with regard to common-law fraud claims.[23]

This court has held that remote purchasers of improvements to real property who have had no direct dealings with the contractor who constructed the improvements may pursue a negligence claim against the contractor. *Briggs v. Riversound Ltd. P'ship*, 942 S.W.2d 529, 532 (Tenn. Ct. App. 1996). However, we have never held that remote purchasers may pursue claims against contractors based on any other theories of liability. In fact, we stated explicitly in *Briggs v. Riversound Limited Partnership* that our holding in the case was limited to negligence claims and that it did not extend to any other claims that remote purchasers might make. *Briggs v. Riversound Ltd. P'ship*, 942 S.W.2d at 532.

Thus, this case requires us to determine whether a remote purchaser may assert a common-law fraud claim against a contractor based on fraudulent misrepresentations to or concealment of information from someone other than the remote purchaser. This court has held that privity does not prevent remote purchasers from asserting a fraud claim against developers who represent to the public that their development is suitable for residential construction when they know of latent conditions that could result in economic injury to the purchasers and subsequent purchasers. *Cooper*

---

[23]The trial court appeared to recognize this distinction during its colloquy with the lawyers regarding the jury instructions. Unfortunately, the jury instructions that were actually given do not clearly reflect this distinction. We need not discuss the adequacy of the instructions further because none of the parties have challenged them on this appeal.

*v. Cordova Sand & Gravel Co.*, 485 S.W.2d 261, 267 (Tenn. Ct. App. 1971).[24] We have determined that this precedent does not authorize the Jenkinses to pursue a common-law fraud claim against Mr. Wright.

The elements of a common-law fraud claim[25] include (1) an intentional misrepresentation of an existing fact, (2) knowledge of the representation's falsity, and (3) injury to the plaintiff caused by reasonable reliance on the misrepresentation. *First Nat'l Bank v. Brooks Farms*, 821 S.W.2d 925, 927 (Tenn. 1991); *Lopez v. Taylor*, 195 S.W.3d 627, 634 (Tenn. Ct. App. 2006). As a general matter, the misrepresentation must be made to the plaintiff and the plaintiff must reasonably rely to his or her detriment on the misrepresentation. *Speaker v. Cates Co.*, 879 S.W.2d 811, 816 (Tenn. 1994). Although liability may be extended to third persons, this is done only when there is evidence that the defendant made the misrepresentation with the intention and understanding that the third parties would rely on the information. *Arcata Graphics Co. v. Heidelberg Harris, Inc.*, 874 S.W.2d 15, 23 (Tenn. Ct. App. 1993).

The Tennessee Supreme Court recently confronted an issue similar to the one before us in another case involving the sale of residential property. The remote purchasers of the property filed suit against the seller's predecessor-in-title after they discovered that the predecessor-in-title had illegally subdivided the property. A jury returned a verdict for the purchasers. The Tennessee Supreme Court vacated the judgment on the purchaser's intentional misrepresentation claim. In light of the essentially undisputed evidence that the seller's predecessor-in-title had made no representations of any kind to the purchasers, the court concluded that no cause of action existed because "[t]here is simply no evidence that . . . [the seller's predecessor-in-title] had any role in the . . . [seller's] sale of the property to the . . . [purchasers]." *Whaley v. Perkins*, 197 S.W.3d 665, 671-72 (Tenn. 2006).

The Jenkinses' fraud claim against Mr. Wright must meet the same fate. The Jenkinses concede that they never talked with Mr. Wright about the house. Likewise, there is no evidence in the record that the Jenkinses were privy to any of the misrepresentations that Mr. Wright may have made to the Browns regarding the structural stability of the house. Accordingly, there is no evidence upon which the jury could have concluded that the Jenkinses relied on any misrepresentations that Mr. Wright may have made. There is likewise no evidence that when Mr. Wright represented to Mr. Brown that the house was constructed on "original dirt" that he intended or understood that anyone other than Mr. Brown would rely on the statement. Thus, in light of the essentially undisputed evidence that Mr. Wright had no role in the Browns sale of the house to the Jenkinses, the Jenkinses cannot recover from Mr. Wright for fraud.

**D.**

---

[24]We have also extended this holding to negligence claims asserted by remote purchasers against developers. *Fullington v. Meadows, Inc.*, No. 03A01-9212-CA-00439, 1993 WL 166287, at * 5 (Tenn. Ct. App. May 18, 1993) (No Tenn. R. App. P. 11 application filed).

[25]"Intentional misrepresentation," "fraudulent misrepresentation," and "fraud" are synonymous and interchangeable terms. *Concrete Spaces, Inc. v. Sender*, 2 S.W.3d 901, 904 n.1 (Tenn. 1999).

-16-

Our conclusion that the Jenkinses cannot recover compensatory damages against Mr. Wright provides the answer to Mr. Wright's challenge to the punitive damage award. In Tennessee, there can be no claim for punitive damages alone. Thus, without an award of compensatory damages or any other sort of remedial relief, an award of punitive damages cannot stand. *Liberty Mut. Ins. Co. v. Stevenson*, 212 Tenn. 178, 180, 368 S.W.2d 760, 761 (1963) (punitive damages cannot be awarded in the absence of actual damages); *B & L Corp. v. Thomas & Thorngren, Inc.*, 162 S.W.3d 189, 223 (Tenn. Ct. App. 2004) (punitive damages cannot be awarded in the absence of actual damages); *Oakley v. Simmons*, 799 S.W.2d 669, 672 (Tenn. Ct. App. 1990) (injunctive relief can support an award for punitive damages). Because the Jenkinses have not succeeded in obtaining compensatory damages from Mr. Wright on their fraud claim, they cannot recover punitive damages from him either.

## IV.

The dismissal of the Jenkinses' claims against their agents and brokers based on their failure to require the Browns to complete an updated disclosure form is affirmed. The judgment against Mr. Wright for compensatory and punitive damages is reversed. Because the jury allocated fault to Mr. Wright, the judgment against all the defendants must be vacated and the case remanded for a new trial.[26] We tax the costs of this appeal in equal proportions to Robert and Sharon Jenkins, and their surety; to Carol Palmer and Folk Jordan Company, Inc., d/b/a Folk Jordan Better Homes and Gardens; and to Frances Garner and Sharon Langford and Associates, Inc., for which execution may issue, if necessary.

 

_____

WILLIAM C. KOCH, JR., P.J., M.S.

---

[26]Allocating fault is peculiarly within the province of the jury. Accordingly, neither trial courts nor appellate courts may reallocate fault. *Jones v. Idles*, 114 S.W.3d 911, 913-14 (Tenn. 2003); *Turner v. Jordan*, 957 S.W.2d 815, 824 (Tenn. 1997); *Hodge v. State*, No. M2004-00137-COA-R3-CV, 2006 WL 36905, at *5 n.3 (Tenn. Ct. App. Jan. 5, 2006) (No Tenn. R. App. P. 11 application filed); *Fye v. Kennedy*, 991 S.W.2d 754, 762 (Tenn. Ct. App. 1998).